Penniman & another *v.* Sanderson & others.

GEORGE PENNIMAN & another *vs.* SARAH E. SANDERSON & others.

If trustees appointed under a will to hold certain real and personal estate in trust, with directions to pay out of the income thereof certain annual sums, and in certain contingencies to pay certain pecuniary legacies in gross, and with power to sell the whole or any part of the real estate, if such sale should become necessary or expedient for the purpose of raising any of the sums of money bequeathed, and to execute and deliver to the purchaser all such deeds as may be necessary to pass a good title, decide that a sale of a lot of land is expedient for the purposes mentioned, and their opinion is not so manifestly erroneous as to show negligence or bad faith, and a sale thereof is accordingly made honestly and fairly, to a *bona fide* purchaser, for a fair price, and the highest one that can be obtained, the sale will be valid and the purchaser will take the land discharged of the trust, although the money was not actually and absolutely needed for the payment of the sums referred to.

Such sale may be deemed to be made under the power conferred by the will and in the exercise of the discretion vested in the trustees, if it is decided by them to be expedient, and a deed is executed by them and the purchase money received by them, although at the same time deeds are also executed to the purchaser by the *cestuis que trust*, with a view to insure a good title.

If the trustees deem it expedient to sell the land for the purpose of raising the sums of money bequeathed, it is unimportant that another and stronger reason inducing them to make the sale is to increase the income of the trust estate.

BILL IN EQUITY, dated January 8th 1864, brought by two children of Elisha Penniman, deceased, against the heirs at law of Daniel Sanderson, deceased, and Charles Heath, surviving trustee under the will of Elisha Penniman, praying for a decree that the defendants should hold certain land in Brookline, devised in trust by Elisha Penniman, and afterwards sold and conveyed to Daniel Sanderson, in trust for the plaintiffs to the extent of their interest therein, and make such payments of money and such conveyances as should be decreed, and for other relief.

Elisha Penniman died on the 5th of November 1831, seised of this farm, and his will, containing the following provisions, was proved in December following:

" After the payment of my just debts and an adjustment of my concerns in business are effected, it is my will that the trustees hereinafter named . . . . . shall take and receive all the rents, issues and profits of my real estate, (except that portion of it devised hereafter to my wife,) and the interest, income and produce of all my personal estate ; and from and out of the same the full sum of twelve hundred dollars shall annually be paid in equal quarter-yearly payments unto my beloved wife, Sibyl Penniman, during the term of her natural life."

"After paying said yearly sum of twelve hundred dollars to my wife, I order and direct that the sum of one hundred and fifty dollars, from and out of the rents, interest and produce of my estate, shall be paid yearly in semi-annual payments to my father-in-law, Joseph Allen, of Braintree, during his natural life, in aid of his comfortable maintenance.

" To Elizabeth Allen, the sister of my wife, I give the yearly sum of four hundred dollars, to be paid to her semi-annually during her life, unless she shall marry. If said Elizabeth shall marry, then the above bequest shall cease, and I give her the sum of four thousand dollars in lieu thereof, which sum shall be paid to her within three months after her marriage.

" To Lydia Allen, another sister of my wife, I give the yearly sum of one hundred dollars, to be paid to her quarter-yearly until she marries or dies. And in case she marries, I give her

one thousand dollars, to be paid to her within three months after her marriage, and the other annuity shall cease.

" To each of the domestics who are in my family, provided they are in my employ at the time of my decease, I give one hundred dollars.

"All the income and produce of my estate, real and personal, which shall remain in the hands of the trustees under this will, after satisfying the aforesaid annuities created for my wife, her father and sisters, shall be paid to and divided equally among all my children, they to share alike."

After the yearly payments should cease, the estate was to be divided equally among his children, with provision for the issue of such as might have died. Provision was also made for the payment of $2000 to each son, upon his becoming twenty-one years of age, and of $1500 to each daughter, upon her marriage.

Charles Heath and Silas P. Tarbell were named as trustees, and the testator expressed his will that they should not be required to give any bond for their fidelity in the execution of the trusts reposed in them until complaint should be made to the judge of probate of their malfeasance or negligence, and he should deem it proper to require such security for the performance of said trusts, any or either of them.

" I give and grant to the trustees and trustee acting for the time being, for the performance of this my will, full power and authority to make sale of the whole or any part of my real estate, if such sale becomes necessary or expedient for the purpose of raising any of the sums of money hereinbefore mentioned and bequeathed, and to execute and deliver to the purchaser or purchasers thereof, any and all such deeds or conveyances as may be requisite to pass a good and valid title in the parts so sold."

"And said trustees and trustee are hereby fully empowered to do, execute and perform all other acts, matters and things whatsoever necessary to carry this will into effect as fully and effectually as if special power was hereby granted to perform each particular act."

The following facts, which appeared by the bill, answers and the agreement of the parties, are all that are material to the points decided :

Elisha Penniman left a widow and eight children. Three of the latter were of age, and five, including the present plaintiffs, were minors. Joseph, Elizabeth and Lydia Allen, mentioned in the will, were living at the testator's death. Joseph died in 1832, and the other two are now living, Elizabeth having married in 1838. Both the trustees named in the will accepted the trust, and Tarbell died in 1848, since when Heath has acted as sole trustee until since the filing of this bill. In January 1832 Joseph Whitney was appointed guardian of four of the minor children of Elisha Penniman, and Silas P. Tarbell was appointed guardian of the other minor child.

It was agreed that Charles Heath would testify that in the February following the death of Elisha Penniman, the trustees were of opinion and decided that a sale of the premises was both necessary and expedient, under and for the purposes of said will, and for raising some of the sums of money mentioned or bequeathed in said will; and also that such sale would be for the manifest benefit of all parties in interest thereunder. In this last opinion, all the adult heirs or devisees, and the guardians of all the minor heirs or devisees of the testator, as well as the minors themselves, so far as they were competent, concurred; and it was thereupon decided and arranged by the trustees and by all parties in interest to sell said premises at public auction. The trustees, as well as said adults and guardians of the minors in interest, consulted eminent counsel as to the proper legal mode of selling and conveying the premises; and were advised that the proper mode would be to obtain license from the judge of probate in the usual manner to sell the minors' interests, and then to sell these, and at the same time all other interests at public auction ; and that the person licensed to sell such minors' interests should by proper deed convey the said minor's interests to the purchaser; that the adult parties in interest, with the husbands of such as were married should execute a deed to such purchaser and that the trustees

under the will should convey to him their interest; and that all sums received for said premises should be paid over to the trustees under the will, to be held subject to its trusts. To make a valid sale, therefore, as advised as aforesaid, the said Joseph Whitney and Silas P. Tarbell, as guardians, each presented petitions to the judge of probate for the county of Norfolk; upon which, after due and proper proceedings, the probate court ordered that Charles Heath, upon his first giving the bond in such cases required, be licensed and empowered to sell and convey the said real estate of which the decree states that said five minors were seised, viz : forty-five sixty-fourth parts of said farm. Heath thereupon gave bond for the performance of these duties; and then, in the manner required by statute, sold at auction forty-five sixty-fourths of this farm, as the interest in said real estate of these five minors. Daniel Sanderson was the highest bidder at said auction, and at the same time and auction purchased at the same rate all the rest of said farm.

It is admitted that this was a fair price and the highest that could be obtained for said land, and that Sanderson had had no connection with said land or its sale till he thus became a purchaser at said auction; that he was a purchaser in good faith and for the value at that time; and that it was the intention of the trustees and all parties in interest then and there to sell to him the whole of said farm.

After this sale, in order to convey to Sanderson the title to the premises, Heath under his license to sell gave a deed purporting to convey to him said minors' interest for $4218.75; Sibyl Penniman conveyed to him one sixty-fourth part, for $93.75; and the other heirs conveyed eighteen sixty-fourth parts for $1687.50; making $6000 in all. At the same time, the trustees executed a deed, referring to Penniman's will, reciting all the above conveyances, stating that the trustees had been requested to execute and deliver this deed, to relieve Sanderson's doubts as to the title, no consideration being named, and conveying to Sanderson all their interest in the land. All of the money received upon the sale to Sanderson was paid over to the trustees, who held the same as a part of the trust property.

It was agreed that Heath would further testify that the inventory showed real estate to the amount of $54,970, and personal estate in the executor's hands to the amount of $21,243.25, and an item " balance due from J. Whitney & Co., uncertain." Of this sum, $1450 was specifically bequeathed ; and $13,926 was in notes not then collectible. The testator was a partner in the firm of J. Whitney & Co., and his interest there was marked as uncertain. " We did not know and I do not think we made any estimate how much it would be. The estate received on this account in 1833 and 1834 over $20,000, the first payment being in July, 1833. Besides the sums mentioned in the will, there was a mortgage by the testator for $10,000, which became due at or about this time, and which was paid in April 1836. All of these things together we took into consideration in managing the trust property, and in deciding that it was expedient to sell the farm. Some of the children at this time were young, and several of them lived with their mother. By the will the surplus income was to be divided among the children, and we considered it more important that they should have a competent income then than afterwards, and that they, among other considerations, had claims to have these estates sold and the proceeds invested in a form to yield a fair and proper revenue to meet their then wants. For the first year of the trust the children received each about $200 of income. At the time of the sale to Sanderson we had received no personal property from the estate, and the proceeds of the sale to Sanderson were the first money we received as trustees, except what we got from rents of real estate. The naked question by itself, whether the personal property in the estate would be sufficient or insufficient to pay the various legacies above mentioned, and the mortgage, was not considered by Mr. Tarbell and myself, trustees, nor was it deemed material, and it is impossible to answer what would have been our decision if we had considered it. The question which, however, we did very carefully consider, included that question, and was this : what was the best mode to manage the property, both to obtain the sums necessary to pay all debts and

legacies, and to derive the best income therefrom for all the purposes of the will ; and this was the question we decided. We had presented for our consideration, and did consider, that we had the said legacies to pay, or might have them to pay, and also the mortgage, and that we had also the annuities given in the will to pay, and also to provide an income as large as practicable, to meet the necessary wants and legitimate claims of the children under the will, and in order to do this we determined, after mature consideration, that it was expedient and best to sell the farm in Brookline.

" The chief reason which led us to decide that it was expedient to sell the farm was, that after the payment of the debts and legacies of the testator from the personal estate, if sufficient for that purpose, we thought that it was expedient and proper to sell this real estate in order to put its value in a form to raise the sums necessary to pay the annuities and incomes provided by the will. Our chief reason was that we might get for these purposes under the will as large an income as possible from it. In this respect it was our purpose to change the investment, and mainly because we did not think, as it then was, the property would yield a sufficient income to meet. the then wants of the testator's children, and especially of those of them who were under age. As to the question whether we knew the ages of the testator's children and when the sums of money given to the boys at their maturity, and to the girls at their marriage, and to Elizabeth and Lydia Allen, in case either of them was married, might be called for, we knew so far as it was possible to know.

" We knew that Elisha came of age in November 1832, and George in September 1837, and Charles in August 1845, and Mary Jane in August 1842, and Sophia in October 1833, and that therefore besides said mortgage the only sums of those last mentioned payable to children, which we should probably have to pay before George's maturity in 1837, were $3500 to Elisha and Sophia.

" Of course, after thirty-three years I can only recall in general the reasons, many of them, which led us to this determination, that it was expedient and necessary for us to sell under the

will; but I know, with the best judgment and consideration we could give to the matter, we did both of us so decide, and that all parties in interest, capable of so doing, concurred with us in deciding that it was expedient to sell the farm."

It was agreed that Mr. Heath would further testify that all the steps taken by the trustees were under the advice of W. D. Sohier, the counsel of Mr. Penniman in his lifetime, and whom he requested them to consult.

Daniel Sanderson entered into possession of the land under the conveyances to him, claiming an absolute title, and no person then supposing that there was any defect in his title, and so held the same until his death in 1863, with the exception of a portion conveyed to another person, in respect to which the plaintiffs make no claim. It was the wish and intention of all parties concerned to make a complete sale and conveyance of the whole title, free from all trusts, to Sanderson, and the above course was adopted by the various grantors and by Sanderson in entire good faith, and with the advice of counsel that it was the proper way to make such title. The estate sold to Sanderson is now worth from $20,000 to $30,000, exclusive of improvements since made upon it.

There were averments and facts agreed upon the questions of laches and ratification on the part of the plaintiffs, which are not reported.

The case was reserved, by *Chapman*, J., for the determination of the full court.

*H. W. Paine & R. T. Paine, Jr.*, (*J. H. Ellis* with them,) for the plaintiffs. The probate court had no power to license the sale, when the legal estate was in trustees. The license therefore was void. The trustees' deed to Sanderson conveyed the dry legal estate, subject to all the trusts declared in the will Sanderson knew of the will, and understood the title of these plaintiffs. He acted with full knowledge of the facts. No consideration was paid by him for the deed of the trustees. He paid the price to other parties; and it is entirely immaterial what they did with it. The trustees never undertook to exercise the power conferred by the will. Sanderson derived his title

from those to whom he paid the price; and took a deed from the trustees simply to quiet his doubts. The error of Sanderson and his advisers was as to the effect of the guardians' deeds. But no mistake of law can avail him, where he has full knowledge of the facts of the title. *Thompson* v. *Simpson*, 1 Dru. & War. 459. *Hicks* v. *Sallitt*, 3 De G., Macn. & Gord. 782. *Parker* v. *Brooke*, 9 Ves. 583. He knew that the trustees were not attempting to exercise the power under the will, but were making a mere change of investment. The trustees' deed declares the reason of the sale to be that it had been determined to be for the benefit of all interested. Sanderson therefore became an express trustee. *Petre* v. *Petre*, 1 Drewry, 393. The power of sale created by the will has never been exercised. It was a strict power, depending on a condition precedent. The contingency contemplated never occurred; and the trustees never considered that the contingency existed.

*B. R. Curtis & C. T. Russell,* for the defendants.

HOAR, J.* Among the numerous questions arising in this cause, which have been presented and discussed with learning and ability by the counsel on both sides, there is one which, in the opinion of all the members of the court who heard the argument, is decisive of it, and renders the consideration of the rest superfluous.

The bill is framed upon the averment that the deed from the trustees to Sanderson conveyed the legal estate in the land in controversy, and seeks to charge it in the hands of the heirs of the purchaser with the trusts for which it was held originally under the will. It is asserted on the one side, and conceded on the other, that the trustees took a fee by implication under the will, and that their deed would therefore pass the fee to their grantee. That either the deed to Sanderson of April 21, 1832, or of May 3, 1847, was sufficient in form to convey all the legal estate which the trustees held and could rightfully dispose of, can hardly be questioned. The latter deed is expressly declared to be made in pursuance of the power and authority

---

* BIGELOW, C. J., did not sit in this case.

given to the trustees by the will, and of any and all powers which could enable them to execute it.

We are then brought directly to the consideration of the question whether the contract of sale which was made in 1832 was a breach of trust, for which either the trustees themselves, or a purchaser with notice, can be held responsible in equity? And we are of opinion that it was not.

We assume, in coming to this conclusion, that the deeds made by the guardians were without authority of law, and were wholly inoperative. They are therefore to be entirely disregarded, except so far as they may properly furnish evidence of the purposes and motives of the trustees.

The discretion given to the trustees by the terms of the will was a large one. They are appointed, in the first place, by the testator, " to be trustees under this will, to receive, take and hold all or any part of my property and estate, for the accomplishment of any, all or either of the purposes for which the intervention of a trustee is either necessary or expedient." They are exempted from giving bonds until, on complaint of their malfeasance or negligence, the judge of probate should order bonds to be given. Their power to sell the real estate is given in these terms : " I give to the trustees and trustee acting for the time being, for the performance of this my will, full power and authority to make sale of the whole or any part of my real estate, if such sale becomes necessary or expedient for the purpose of raising any of the sums of money hereinbefore mentioned and bequeathed, and to execute and deliver to the purchaser or purchasers thereof any and all such deeds or conveyances as may be requisite to pass a good and valid title in the parts so sold."

In construing this last extract from the will, we are to determine what was meant by " necessary " and what by " expedient." It might be said that a sale of real estate could not be necessary to raise the sums of money bequeathed by the will, if they could be raised from any other source; and as the personal estate appears to have exceeded the amount required, the necessity contemplated did not exist. But the trustees are also

allowed to sell whenever a sale becomes " expedient;" and this gives them a much wider latitude. There is no other test of expediency prescribed by the testator than the sound discretion and judgment of the trustees. Undoubtedly they were bound to exercise such a discretion; and cases might be supposed in which a court of equity would intervene to control a manifest abuse of it. But if the sale was made for the purpose of raising any of the sums of money bequeathed in the will, if it was honestly and fairly made, and in the opinion of the trustees was an act which would benefit the parties interested in the execution of the trust, they were justified in making it. It had then become " expedient," within the meaning of the will. To give the phrase any force, it is clear that it must be held applicable to cases where the money was not actually and absolutely needed for the payment of the legacies.

And if the sale was in this manner found to be expedient, it certainly would not impair or diminish the right to make it, that it was desirable for other reasons besides those for which it was expressly authorized. It is only to appear affirmatively that the sale was regarded by the trustees as expedient for the purpose of raising the sums of money bequeathed in the will, and that their opinion was not so manifestly erroneous as to show negligence or bad faith.

The argument for the plaintiff on this point, however, is based upon two propositions : first, that there was never a sale which was designed to be made under the power given by the will; and secondly, that the discretion, if any was confided to the trustees as to the expediency of making a sale for the purpose of paying the legacies, was never exercised by them.

It is admitted that the sale at public auction was for a fair price, and the highest that could be obtained for the land; that Sanderson was a purchaser in good faith and for the full value at the time ; and that it was the intention of the trustees and all parties in interest then and there to sell to him the whole of the farm. It further appears from the evidence, which is not contradicted, that the trustees were of opinion and decided that a sale of the farm was expedient, under and for the purposes of the

will, and for raising some of the sums of money mentioned or bequeathed therein; and also that such sale would be for the manifest benefit of all parties in interest. This also appears to have been the original design and purpose of the trustees in making the sale. When this had been resolved upon, and the advice of counsel was taken as to the mode in which it should be carried into effect, the plan was adopted of a conveyance of the interests of the *cestuis que trust,* directly by those who were of adult age, and by the guardians of the minors under a license from the probate court. This form of conveyance, the plaintiffs now contend, should be regarded as the essence of the transaction. But we do not think it can be so considered. The purchase money was all paid to the trustees, to be held for the uses of the will; and the proof is satisfactory that it was understood and agreed from the outset that it should be so applied. The trustees conveyed their title, and the rest was all matter of form, supposed to be necessary to effectuate the intention. That the deeds given by the guardians were wholly nugatory and ineffectual cannot make the title which passed directly from the trustees any the less valid.

Another and important consideration is this : At the time the farm was sold, the trustees had received no personal estate from the executors; and they did not receive any for a year afterward, and then but $2000 at first. There were some of the legacies becoming due, and it appears that part of the price for which the farm was sold was used toward paying them. It is therefore clear that there was no impossibility that the amount received from the sale could be used to discharge the legacies. There was nothing in the language, nor, that we can perceive, in the intent and purpose of the provision in the will, which conferred the power of sale, which restricts its exercise to the very time when the legacies were immediately payable. In providing the means of payment, the trustees might rightfully consider a future as well as a present obligation. As they were to pay the legacies at some time, and meanwhile were to pay the annuities, it might seem to them expedient to dispose of unproductive and expensive real estate for that purpose; and

not to prevent the investment of personal estate in a productive and profitable manner, or be obliged to use that which was already invested judiciously, when the time for payment should arrive.

There might even be ground for maintaining the proposition that, under so broad a power as the will created to sell any of the real estate if such sale should become expedient for the purpose of raising any of the sums of money mentioned and bequeathed therein, it would have been competent for the trustees to sell it for the purpose of more conveniently raising the annuities which were to be paid to the widow and others. These annuities are sums " mentioned and bequeathed " in the will; and although the annual payment to the wife is expressly ordered to be made from the rents, profits and income of the real and personal estate, yet we do ·not see that it might not become " expedient," within the fair meaning of that term, to sell real estate and invest the proceeds, with a view of paying the annuity from the income thus secured, and so leaving other parts of the estate to be devoted with more convenience and advantage to the other uses of the will. But we have no occasion to put the decision upon this ground.

That the trustees did decide that it was expedient to sell the land for the purpose, among others, of having money at their command from which to pay the legacies as they should become payable, we think is fully shown by the evidence. Mr. Heath testifies that " the naked question by itself, whether the personal property in the estate would be sufficient or insufficient to pay the various legacies and the mortgage due Sohier & Dexter, was not considered, nor was it deemed material." But he adds : " The question which, however, we did very carefully consider, included that question, and was this : what was the best mode to manage the property, both to obtain the sums necessary to pay all debts and legacies, and to derive the best income therefrom for all the purposes of the will ; and this was the question we decided." " The chief reason which led us to decide that it was expedient to sell the farm was, that after the payment of the debts and legacies of the testator from the

personal estate, if sufficient for that purpose, we thought that it was expedient and proper to sell this real estate in order to put its value in a form to raise the sums necessary to pay the annuities and incomes provided by the will. Our chief reason was that we might get for these purposes under the will as large an income as possible from it." If it follows from this statement that the chief reason which influenced the trustees was to change the investment, in order to increase the income, as the plaintiffs allege, yet if they had in mind also the duty of paying the legacies, and considered it expedient also as a means of more conveniently providing for their payment, which it appears was the case, it was within the scope of their discretion. It might be deemed expedient to sell the land for the purpose of paying the legacies, if the sale and investment of the proceeds enabled them to provide for the annuities, and thus to appro priate other funds to the payment of the legacies, which, but for the sale of the land, would have been needed to pay the annuities. Which was the chief reason for the course taken is unimportant, if it appeared to them expedient to take it for the purpose which the will authorized.

The other objections to the maintenance of the suit which the defendants have presented, though worthy of serious consideration, need not be decided. They are founded upon facts which would at least furnish reason for adopting the most liberal construction of the powers given to the trustees, and for taking an indulgent view of their acts. But what seems to us a fair and just construction of the power vested in the trustees by the will, irrespective of any other considerations, has led to the conclusion that this power was lawfully and duly executed, and that the judgment must be       *Bill dismissed, with costs.*