George Hunter RAFFETY, Individually and as Trustee of the Raffety estate, Pauline Raffety, Ellot Hunter Raffety, Martha Raffety, Mary Raffety, Captola Raffety and Mildred Smith, Appellants,

v.

Bessie B. Raffety PARKER, Appellee.

Victor B. HARRIS, Guardian ad litem for the minor defendants, Joe Grant Raffety, Fred Dennis Raffety, Phillip Stephen Raffety, Daniel Raffety, John Ulysses Raffety and Julia Elizabeth Raffety, Appellant,

v.

Bessie B. Raffety PARKER, Appellee.

Nos. 15617, 15618.

United States Court of Appeals Eighth Circuit.

Feb. 7, 1957.

**596**

L. D. Joslyn, Charleston, Mo. (T. B. Russell and Joslyn & Joslyn, Charleston, Mo., were with him on the brief), for appellants Raffety and others.

Victor B. Harris, St. Louis, Mo., for appellant Harris.

David E. Blanton, Sikeston, Mo. (Blanton & Blanton, Sikeston, Mo., were with him on the brief), for appellee.

Before SANBORN, WOODROUGH and WHITTAKER, Circuit Judges.

WHITTAKER, Circuit Judge.

This is an action to construe a trust, and to require an accounting by the Trustee of his stewardship of the trust, brought by the widow of the Trustor who is one of several life income beneficiaries of the trust, and the principal question involved is whether, under the language of the instrument creating the trust and the circumstances, the Trustee was authorized to set up, as he did, an annual depreciation charge to cover the wear-out of buildings, machinery and equipment consumed in operating the trust's business, and to charge the same against gross income in determining the "net income" of the trust, which alone was distributable to life income beneficiaries.

Federal jurisdiction rests upon diversity and requisite amount. For convenience, we will refer to the parties as they appeared in the trial court.

The significant facts are that E. F. Raffety had accumulated a large plantation and affiliated industries in and near the village of Wyatt, in Mississippi County, Missouri, which he operated as as integrated business. He had a wife but no children, and his nephews, George Hunter Raffety and U. G. Raffety, sons of his deceased brother, had for many years lived with him and worked in his enterprise.

Being ill from an incurable disease, E. F. Raffety, as grantor (hereafter called Trustor), joined by his wife, on October 15, 1943, entered into an Indenture of Trust with his nephew, George Hunter Raffety, as Trustee. That Indenture, in its preamble, stated Trustor's reasons for, and purposes in, creating the trust, in the following language:

"Whereas, said Grantor has built a large business which has become a part of the community life of the village of Wyatt, Missouri, and adjacent community; and whereas, the Grantor by virtue of his business success has been able to contribute and assist in the welfare and prosperity of said community; and whereas, said *Grantor desires that his said business and its contribution to the life of the community be continued after his death and remain in charge of persons competent to manage and preserve same;* and whereas, said Grantor desires to insure an adequate income for his wife throughout her life; and whereas, George Hunter Raffety, Trustee herein, has given faithful service to the Grantor in the management, operation and building of said business to the extent that the said grantor deems he is capable of continuing the management *and growth of the same.*" (Emphasis supplied.)

The Indenture then conveyed to the Trustee, and his successors in trust, 17 described tracts of land, and also a cotton gin and appurtenant buildings, machinery and equipment, and a warehouse and its appurtenant equipment, located on lands, in Wyatt, leased from the Cotton belt Railroad, and also a ¾ interest in a partnership, known as "Raffety and O'Rourke" that owned and operated, in Wyatt, an alfalfa dehydrating plant.

The Indenture next provided:

"Within sixty-five days after the close of each taxable year the Trustee shall pay out of the net income

of the trust estate for the then immediate past taxable year, out of the principal thereof if the net income is insufficient, to the beneficiaries herein named or to their successor beneficiaries as designated in Section 5 of this Indenture of Trust, as follows:

"(1) To Bessie Beck Raffety, wife of the Grantor, Twenty Four Hundred ($2,400) Dollars or a sum equal to fifty percent (50%) of the entire net income of the trust estate for the then immediate past taxable year, whichever amount is the greater.

"(2) To George Hunter Raffety a sum equal to twenty percent (20%) of the entire net income of the trust estate for the then immediate past taxable year.

"(3) To U. G. Raffety a sum equal to ten percent (10%) of the entire net income of the trust estate for the ten immediate past taxable year.

"The balance of the said net income, if any, shall be accumulated by the Trustee and shall be added to the principal of the trust estate and become a part thereof."

The Indenture next provided that, to enable the Trustee to carry out "the express purposes of this trust" and to aid in its execution and proper administration and management, "the Trustee is vested with the following additional powers and discretions:"

"At his option and as long as he may deem advisable, to retain any property and to continue and operate any business which he may receive hereunder * * *

* * * * * *

"To invest the principal (and income if accumulated) in any property whether or not permissible by law as investment for trust funds.

"*To determine in his discretion what is principal, gross income, or net distributable income of the trust estate.*"

"*All discretions in this trust conferred upon the Trustee shall,* unless specifically limited, *be absolute and uncontrolled and their exercise conclusive on all persons interested in this trust or the trust estate.* The powers and discretions of the Trustee enumerated herein are not to be construed as a limitation upon his general powers and discretions; but the Trustee in addition thereto is hereby vested with and shall have for the full duration of this trust, as to the trust estate, the income therefrom, and in the execution of this trust, *the same and all powers and discretions that an absolute owner of property has or may have.*" (Emphasis supplied.)

The Indenture then provided that, before making any distribution, the Trustee shall pay, out of "gross income", or out of principal if the gross income is insufficient, all general and special taxes, and all expenses and liabilities of every kind expended or incurred in the administration of the trust, "including the protection of this trust and its defense against legal attack", and the fees of the Trustee, which were fixed at 5% of the "yearly income", and, if the Trustee devotes the major part of his time to the management of the business of the trust, he was to have a "reasonable salary."

The Indenture then provided that upon the death of Trustor's wife the trust shall end, and that thereupon the Trustee shall make a final settlement, and shall pay over and convey 60% of the trust estate to George Hunter Raffety or, if dead, to his descendants, in equal shares per stirpes, and, if no descendants, to his widow; and 40% to U. G. Raffety, or, if dead, to his descendants, in equal shares, per stirpes, and, if no descendants, to his widow.

The Indenture then provided that the Trustor might, by his last will, devise or bequeath other property to the Trustee to become a part of the corpus of the trust; that should any beneficiary of the trust or of his will contest, or incite a contest, of either, they would thereby

forfeit all interest in the trust; that the Trustee shall, as soon as practicable after the close of each taxable year, render a complete statement to the beneficiaries containing a complete inventory of the trust estate and showing all transactions, income and disbursements of the trust in the past taxable year.

The Indenture then provided:

"The Trustee if he deems it to be for the best interest of the trust estate, shall by executing and duly acknowledging an instrument in writing, appoint as co-Trustee hereunder any person who he may deem suitable. Such co-Trustee so appointed shall exercise jointly with the Trustee herein named, all of the duties, powers, discretionary or otherwise, herein granted to the Trustee.

"The Trustee by will, or by executing and duly acknowledging an instrument in writing, may appoint his successor Trustee hereunder. The successor Trustee so appointed shall have all of the duties and powers, discretionary or otherwise, granted to his predecessor Trustee hereunder."

The Indenture then provided that it should be governed by the laws of Missouri, and concluded with the statement that Bessie Beck Raffety, wife of the Trustor, joined in the Indenture for the purpose of conveying all of her dower, statutory and other legal interest, in the property conveyed to the Trustee, and that the Trustee would faithfully perform and fulfill the trust.

E. F. Raffety died testate on November 26, 1943, and, by his will, after making a number of specific bequests, left the residue of his estate to the Trustee under the said Indenture, and it became a part of the corpus of the Trust.

The result was that the trust estate then consisted of about 2,300 acres of farm lands with numerous tenant houses, barns and similar farm buildings thereon; more than 40 mules (which were later replaced with tractors); a number of tractors and trucks and the necessary complement of farm machinery and equipment; two cotton gins and appurtenant buildings, machinery and equipment; a warehouse and appurtenant equipment; a general store; and a ¾ths interest in the partnership known as "Raffety and O'Rourke" which owned and operated an alfalfa mill and appurtenant buildings, machinery and equipment, all in or near the village of Wyatt, Missouri, which the Trustee, as contemplated by the provisions of the trust instrument, began operating about December 1, 1943, and has since continued to operate, as an integrated business, in much the same manner as Trustor had done in his lifetime.

In his operations of the trust the Trustee from time to time made repairs to the buildings, machinery and equipment of the trust and deducted those costs from gross income as operating expenses, and, in addition, he annually set up on his books, and charged against gross income, depreciation on those assets of the trust that were being consumed through being worn out in normal use in the trust's business for the production of income, and each year the Trustee furnished an accountant's statement to the beneficiaries of the trust, including the plaintiff, showing, under a capitalized heading of depreciation, the amount of depreciation taken on the various wasting assets. No exception was taken thereto until March of 1952, when the Trustor's widow (who had remarried about two years after Trustor's death) personally, and through her brother, expressed dissatisfaction, saying she never had liked the idea of the trust and felt that she should have a widow's share of her husband's estate.

Soon afterward this suit was filed by plaintiff, the widow of the Trustor, in 11 counts, against the Trustee as such and individually, and against his children and wife, as contingent remaindermen, and against the children and widow of U. G. Raffety (who died in March of 1952) as income beneficiaries and remaindermen under the terms of the trust. Count I sought to surcharge the Trustee with one half of the depreciation taken on

wasting assets in past years of the trust's operations. Count II sought to surcharge the Trustee with one half of the repair expenses paid in past years of the trust's operations, upon the ground that they had been excessive. Count III sought to surcharge the Trustee with one half of the trust's loss of $9,747.74, resulting from (a) damage to a diesel engine and a hammermill in the alfalfa mill of the partnership of Raffety and O'Rourke occurring in an accident twelve days after the trust began operations, and producing a loss to the trust of $7,-084.61; (b) a burglary loss of cash from the store, in the amount of $2,449.40; and (c) fire damage to the roof of a tenant house, in the amount of $213.75, all upon the ground that the Trustee had charged these costs to expenses, which thus reduced income, when he should have charged them to capital. Count IV sought to surcharge the Trustee with one half of 6% compound interest on sums paid by him, from the principal of the trust, as premiums on a $100,000.00 policy of insurance upon his life in favor of the trust, upon the ground that such was not an income-producing investment and was therefore improper. Counts V and VII each sought damages from the Trustee for engaging, as a partner, in businesses alleged to have competed with the trust. Count VI sought damages from the Trustee in respect to the sale of the trust's cotton gin No. 2. Count VIII sought to recover from the Trustee amounts paid to him for past services to the trust, because of alleged failure properly to perform his trust. Count IX sought damages from the Trustee for alleged breach of trust. Count X sought to surcharge the Trustee for the amount of attorney's fees and court costs paid in connection with the Trustee's defense of this case. Count XI sought removal of the Trustee.

The defendants answered—the minor children of U. G. Raffety, by Victor B. Harris as their guardian ad litem. George Hunter Raffety, as Trustee and individually, in essence, denied all of the charges of misfeasance and breach of trust alleged against him in the complaint, and denied any impropriety in setting up an amount of depreciation to cover the wear-out of buildings, machinery and equipment consumed in operating the trust's business and in charging the same against gross income to determine "net income" of the trust, and asserted that, as Trustee, he was under duty to do so, and unless done would discriminate against the remaindermen by paying to the life income beneficiaries annually an aliquot part of the principal of the wasting assets consumed in the trust's business, when the life income beneficiaries are entitled only to "net income". He also asserted that the plaintiff, from the beginning of the trust's operations, had full knowledge, from the annual statements furnished her, that depreciation was being charged to cover the wear-out of property consumed in the trust's operations, and that by accepting her share of the net income of the trust, computed on that basis, over all past years of the trust's operations, without any protest, she had adopted the interpretation that the Indenture authorized such depreciation and should be held bound by that interpretation. The other defendants simply denied the allegations of the complaint, except Harris, guardian ad litem, asserted that a proper amount of depreciation on wasting assets was properly chargeable against the income of the trust, but that the life insurance premiums, though proper, should have been charged against income and not against principal.

Upon the principal issue in the case—that of the propriety of charging depreciation on wasting assets—it was stipulated by the parties as follows:

"It is agreed that the issue in Count I is whether net income should be computed with or without regard to allowance for depreciation and not that the basis used for depreciation charges as shown by the annual financial reports is an improper basis if such depreciation charges are allowable."

The case was tried before the Court without a jury. The Court filed his memorandum opinion on February 28, 1956, finding the issues on Counts II, V, VI, VII, VIII, IX and X in favor of defendants, and plaintiff has not appealed, and, therefore, those counts need not be further noticed, unless they become material in connection with Count XI, which sought removal of the Trustee. But the Court found the issues upon Counts I, III, IV, and XI in favor of plaintiff.

Upon Count I the Court found that depreciation was not allowable and should not have been charged against gross income of the trust in determining the "net income" distributable to plaintiff as one of the life income beneficiaries of the trust, and that, to the time of the accounting (which appears to have been the fiscal year's end of March 31, 1955) the Trustee had charged depreciation amounting to $205,457.90, and the Court concluded that the Trustee should pay one-half that sum, or $102,728.95, to the plaintiff and charge the payment to the trust.

Upon Count III the Court found that the damage to the diesel engine and hammermill, the burglary loss of cash and the fire loss to the tenant house, aggregating $9,747.76, should not have been charged to income but to capital, and he concluded that the Trustee should pay one-half that amount, or $4,873.88, to the plaintiff and charge the payment to the trust.

Upon Count IV the Court found that the Trustee was not authorized to insure his life in favor of the trust, and that the annual premiums of $2,285.00 paid, from the principal of the trust, upon the $100,000.00 policy on the Trustee's life in favor of the trust—aggregating, to the date of the accounting, the sum of $25,135.00, and giving the policy, at that time, a cash value of $23,700.00—were improper and an unauthorized investment of trust funds, and he concluded that the Trustee should pay to plaintiff one-half of 6% compound interest on those annual premiums over all past years, which amounted to $6,720.23, and charge the payment to the trust.

Upon Count XI, the Court found that the Trustee was not guilty of bad faith, breach of trust, or "any act of dishonesty", and should not be removed, but that, because the Trustee was both a life income beneficiary and a remainderman under the terms of the Indenture, he had conflicting interests, and because since 1952 the Trustee had spent most of his time in California (partly in working out the collection of the sale price of the trust's cotton gin No. 2 of $70,000.00—all or nearly all of which now appears to have been collected) and since 1952 had spent only about three months of each year in the personal operation of the trust's business, he had, in effect, abandoned the trust, and the Court ordered appointment of a co-Trustee of the trust estate.

Thereafter, on March 13, 1956, the Court entered judgment for plaintiff, on Count I in the amount of $102,728.95, on Count III in the amount of $4,873.87, and on Count IV in the amount of $6,720.33, all "to be paid from the trust fund by the Trustee", and on these counts the judgment continued, saying:

"It is the further order, judgment and decree of the Court that the Trustee shall not pay to the persons, other than plaintiff, Bessie Beck Raffety Parker, who are entitled to the income of the trust estate, a proportionate share of the amounts heretofore or hereafter withheld for a depreciation reserve (Count I) or of the amounts heretofore withheld for casualty losses (Count III) and shall not pay them any interest on the amounts heretofore or hereafter paid by the Trustee for life insurance premiums (Count IV)."

On Count XI, the judgment appointed a co-Trustee "with powers equal to that of the defendant, George Hunter Raffety", and provided "that the compensation of the co-Trustee shall be as provided for in the trust instrument" and that, except as to the Trustee's fee of 5% of net yearly income, George Hunter Raf-

fety "shall draw no salary as Trustee until he can and does personally look after the business of the trust as a resident of Missouri as he was at the time the trust was executed." (The Trustee had not drawn any salary since he began spending the major part of his time in California.)

Being aggrieved by the judgment, George Hunter Raffety, as Trustee and individually, and all other defendants, save Harris, guardian ad litem, have appealed therefrom to this Court in No. 15,-617, and Harris, guardian ad litem, has appealed in No. 15,618, but inasmuch as the two appeals involve the same subject matter and issues, we will determine both in one opinion. Further facts as material will be stated in the course of our discussion.

Was the trial Court right or wrong in holding that, under the terms of this Indenture and the circumstances, the Trustee was not authorized to set up a depreciation on those assets in the corpus of the trust that were being consumed by being worn out in normal use in the trust's business, nor to charge that depreciation against gross income in arriving at the "net income" distributable to the life income beneficiaries?

The trust consisted of a business. It contemplated that the business "be continued after (Trustor's) death." It provided that the "net income" should go to the widow and others until the death of the widow, and thereupon the corpus should go to named or determinable remaindermen. As contemplated, the Trustee has continued the business. Being, naturally, unable to continue the business without, or with worn-out, machinery and equipment, the Trustee was economically compelled to, and did, replace those items in the corpus of the trust which were worn out in normal use in continuing the trust's business for the production of income. For that purpose he set up an annual depreciation reserve, just as the Trustor, in his lifetime, had done, which, through the 11 years and 4 months of operations to the accounting period here involved, amounted to $205,-457.90, and that sum, plus about $21,000.-00, was, in the same period, expended for replacement or new capital assets costing $226,616.98. In this way the trust's business was kept efficiently operable and profitable, as witness the fact that, in the period stated, the trust not only increased corpus from $331,660.13 to $404,174.12, but produced distributable "net income", after all expenses including said depreciation, of $361,077.75, of which plaintiff's 50% was $180,652.35 or an average of $15,839.84 per year. It was one half of that depreciation or $102,728.95, that the Court ordered paid to the plaintiff and charged to the trust, though he held that other life income beneficiaries, taking under the same provisions of the trust, were not entitled to like treatment.

There is no question about the fact that such depreciation did, in truth, occur, nor is there any question about the rate and amount of depreciation taken by the Trustee, for it is stipulated by the parties that the issue is "whether net income should be computed with or without regard to allowance for depreciation and not that the basis used for depreciation * * * is an improper basis." Hence, the question is whether, under this trust Indenture and the circumstances, the Trustee was authorized to deduct actual depreciation in determining "net income."

The Indenture does not define "net income", but it does say that "the Trustee is vested with the * * * powers and discretions * * * To determine in his discretion what is principal, gross income, or net income of the trust estate", and that his discretion shall "be absolute and uncontrolled and * * * conclusive on all persons interested in this trust or the trust estate." Is this covenant in this contract a valid one? If it is, then, being clear and unambiguous, it means what it says and must be enforced, unless the discretion be abused by arbitrary exercise.

Under the law of Missouri, which governs this instrument, and under the law generally, such covenants are held to be valid, and such discretion of

the Trustee, when not abused by being exercised unfairly and arbitrarily, will be upheld.

The case of Mercantile-Commerce Bank and Trust Co. v. Morse, 356 Mo. 336, 201 S.W.2d 915, 918, involved a testamentary trust which said "My Trustee shall have power to determine whether any money or property coming into its hands shall be considered part of the principal of said trust estates or a part of the income therefrom, and to apportion between such principal and income any loss or expenditure in connection with such trust estates, *which in its opinion should be apportioned, and as to it may seem just and equitable.*" The Trustee brought the action to construe the trust provisions, including particularly the quoted one. The Missouri Court held that the quoted language did not give to the Trustee an uncontrolled or unlimited discretion, but did give it a limited discretion to do "what 'may seem just and equitable' to the trustee." In dealing with the point, the Court said, at pages 922–923 of the Southwestern report:

"The trustee seeks instructions in the alternative as to either its duty or discretion under the will in regard to the accounting practices we have been discussing. We have set out the rules which guide a trustee where the will is silent. Where, however, a trustee is given the discretion to make apportionments between income and corpus, then it is ordinarily the duty of the trustee to exercise that discretion. * * *

"A Court in a proper case always has the power to instruct a trustee whether a contemplated act lies within the trustee's discretion. *This does not involve exercising the discretion but determining whether it exists. After such fact is determined, the exercise of the discretion is a matter for the trustee.* Nossaman, Trust Administration, § 443." (Emphasis supplied.)

The case of Commissioner of Internal Revenue v. Saltonstall, 1 Cir., 124 F.2d 110, though a tax case, and therefore not generally applicable, is in point on this question. There a testamentary trust provided, at page 116, that "my trustees shall have full powers of determining all questions in regard to such apportionment and all questions whether any moneys or things are to be treated as capital or income * * * and every such determination whether made upon a question actually raised or implied in the acts or proceedings of my trustees shall be conclusive and binding upon all persons interested." A question arose as to the propriety of the action of the Trustees in allocating part of the 1935 income from a building, owned by the trust, to depreciation before determining the income that was "distributable" to the taxpayer who was an income beneficiary of the trust. The Court, in dealing with the question, said, at page 116:

"Under this provision in the trust instrument the trustees have wide discretion in making allocations as between principal and income. See Dumaine v. Dumaine, 1938, 301 Mass. 214, 16 N.E.2d 625, 118 A.L.R. 834. Whether as between the trust and the federal government a deduction for depreciation could be taken in 1935, it seems clear that Mrs. Saltonstall could not successfully challenge the action of the trustees in allocating part of the 1935 income to depreciation before determining the distributable shares of the beneficiaries. The capital asset, the building, with some years of useful life ahead, is continuing to depreciate in fact. The power of the trustees, as against the income beneficiaries, to make provision for this continuing depreciation, is not dependent upon whether the trustees are entitled to take a deduction for depreciation in order to diminish the tax liability of the trust to the federal government."

In Dumaine v. Dumaine, 301 Mass. 214, 16 N.E.2d 625, a Trustee sought instructions respecting his discretionary powers under a trust that provided for income to one group for a determinable period, and for conveyance of the corpus to

another group at the end of that period. The Court said, 16 N.E.2d at page 626:

"The sole question for determination is the power of the trustee under the following clause of the trust indenture: 'The trustee under this instrument shall have full power and discretion to determine whether any money or other property received by him is principal or income without being answerable to any person for the manner in which he shall exercise that discretion' ".

The Court, after an exhaustive and scholarly review of the general subject of apportionment between life income beneficiaries and remaindermen of trust property being consumed in the production of income, said, 16 N.E.2d at page 629:

"The court may properly have in mind that, when a settlor reposes a discretion in a trustee, he does so because he desires the honest judgment of the trustee, perhaps even to the exclusion of that of the court. In reposing a discretion he must be held to have known that human judgment is not infallible. It is not for the court to read into a trust instrument provisions which do not expressly appear or which do not arise by implication from the plain meaning of the words used, Trustees of Smith Charities v. [Inhabitants of] Northampton, 10 Allen 498, 502 [82 Mass. 498, 502]; Penniman v. Sanderson, 13 Allen 193, 204 [95 Mass. 193, 204]; Bremer v. Hadley, 196 Mass. 217, 81 N.E. 961, and the court will not substitute its discretion for that of the trustee except when necessary to prevent an abuse of discretion. Proctor v. Heyer, 122 Mass. 525; Bradlee v. Anderews, 137 Mass. 50, 55; National Exchange Bank v. Sutton, 147 Mass. 131, 135, 16 N.E. 759; Wright v. Blinn, 225 Mass. 146, 148, 114 N.E. 79. It has been said that doubtless a trust might be created which by its terms would make his judgment, however unwise it might be, the final test.

Corkery v. Dorsey, 223 Mass. 97, 101, 111 N.E. 795. See Gisborne v. Gisborne, 2 L.R.App.Cas. 300."

The Court continued, saying, 16 N.E. 2d at page 630:

"We do not think the clause in issue confers an absolute and uncontrolled discretion. Nor do we think that it limits the trustee to the determination of the matter involved in cases where there is a question of doubt or no rule of law to guide him. * * * But he [the Trustor] did intend to give the trustee a power to determine what was principal and income, although he refrained from conferring that power as an absolute and uncontrolled discretion, and we regard this as significant, in the light shed upon the inquiry by a consideration of all factors. The discretion conferred is not an empty one. It confers an important responsibility to make a determination which, if honestly exercised, calls for no revision by the court. Am.Law Inst. Restatement: Trusts, §§ 187, 233.

" * * * The possibility of conflicting interests between life tenants and remaindermen as to what is principal and income is not of primary importance in determining whether a certain gain to a trust estate is taxable as income. It is important, however, to observe that in one connection a gain is classed as income and in another as principal and that this court sees no inconsistency in such classifications. A settlor of a trust must know that unless he says something to the contrary in his trust instrument, the court's classification will be followed in the administration of his trust. We see no good reason why he cannot be permitted to do that which the court itself can do by way of classification and also to delegate the power of classification to his trustee. If the delegation of power is comprehensive and sufficient the court must respect it and make ef-

fectual the expressed intent of the settlor."

And the Court concluded that the Trustee, under the clause in question, had "full power and discretion, after serious and responsible consideration, short of arbitrary or dishonest conduct or bad faith, or fraud, * * * to determine whether any money or other property received by him is principal or income", and that the Courts must respect and enforce such provisions. To precisely the same effect are the cases of In re Wells' Estate, 156 Wis. 294, 144 N.W. 174; Chase National Bank of City of New York v. Chicago Title & Trust Co., N.Y., 246 App.Div. 201, 284 N.Y.S. 472, affirmed without opinion 271 N.Y. 602, 3 N.E.2d 205, rehearing denied 271 N.Y. 659, 3 N.E.2d 472, and Mayberry v. Carey, 268 Mass. 255, 167 N.E. 281. In Am. Law Inst. Restatement of the Law of Trusts, p. 479, Section 187, it is said, "Where discretion is conferred upon the Trustee with respect to the exercise of a power, its exercise is not subject to control by the Court, except to prevent an abuse by the Trustee of his discretion."

■ We are not cited to, and we do not find, any authorities to the contrary. It must, therefore, be regarded as settled in Missouri, and generally, that a power given by a trust instrument to a Trustee to determine, in his discretion, what part of the receipts of the trust are income and what are principal is a valid covenant and must be respected by the Courts, and the exercised discretion of the Trustee thereunder, if not fraudulent, capricious or arbitrary, must be enforced.

Here, there is no charge or finding of bad faith, fraud or capriciousness on the part of the Trustee in setting up and deducting the depreciation in question, rather the Court found to the contrary. Was the Trustee's action arbitrary? We think that it was not. Rather, we believe that, in this case, the Trustee, in discharge of the required impartiality to both life income beneficiaries and remaindermen, was discretionally justified in setting up and deducting depreciation in determining "net income" distributable to life income beneficiaries, thus to avoid payment to them annually of an aliquot part of the principal of trust assets worn out through the required continuance of the trust's business for the production of income, when, under the trust instrument, those life income beneficiaries are entitled only to "net income" of the trust. The Missouri courts have consistently so held.

In Orr v. St. Louis Union Trust Co., 291 Mo. 383, 236 S.W. 642, 645, a testamentary trustee petitioned for instructions on a like point. The trust there required that "said trustee shall pay to my beloved wife * * * the whole of the net income from said trust estate, so long as she lives", and thereafter the corpus was to vest in certain remaindermen. A question arose as to whether expenditures by the Trustee in meeting special tax assessments against, and in improving, a permanent building owned by the trust, and which was operated for income, should be deducted from the gross receipts of the trust in determining net income distributable to the widow. In answering the question the Court said, 236 S.W. at page 648:

"It is incumbent upon testator's trustee, under the provisions of the will, to preserve the property intact and to keep it in such shape that it will produce earnings. If liens for public improvements are suffered to be enforced the property cannot be kept intact, and, if destroyed buildings are not replaced, the earnings necessarily will be reduced. The cost of permanent improvements to real estate benefiting both the life estate and the remainder, and the amount of special taxes for public improvements chargeable against such real estate and likely to outlast the life estate, should be apportioned between the life tenant and the remaindermen. 16 Cyc. 634; 21 C.J. 957; Reyburn v. Wallace, 93 Mo. 326, 3 S.W. 482; Bobb v. Wolff, 54 Mo.App. 515; [William R. Bush] Construction Co. v. Withnell, 190

Mo.App. [33] loc.cit. 42, 175 S.W. 260.

"But we do not understand that the trustee is liable to the life tenant for the payment for such purposes made by it out of gross income from the trust estate. The primary liability is on the life tenant, at least to the full extent of the income. The apportionment of the cost is a matter of contribution between the life tenant and the remaindermen. *It was the clear duty of the trustee to preserve the property intact before paying any income to the life tenant."* (Emphasis supplied.)

In Mercantile-Commerce Bank & Trust Co. v. Morse, 356 Mo. 336, 201 S.W.2d 915, a testamentary trustee petitioned for instructions as to whether premiums paid by the Trustee for certain debt securities (bonds) should be apportioned between life income beneficiaries and remaindermen by deducting annually from the interest thereon an amount which would fully amortize the premium so paid by the date of maturity of the bonds, when only the par amount would be due. In answering the question, the Supreme Court of Missouri said, 201 S.W.2d at page 919: "The direction in paragraph 13 to pay Dorothy 'the entire net income and revenue' does not evidence an intent to pay her what would ordinarily be considered as principal", and the Court continued, 201 S.W.2d at page 920:

"In deciding whether such sums should be deducted from the principal of the estate, and thus lost by the ultimate beneficiary, or whether they should be amortized out of income collected and the principal thus kept intact, *the trustee is under a legal duty to act with due regard to the respective interests of all beneficiaries both immediate and remote.* In impartially exercising his duties to all beneficiaries a trustee is ordinarily required to make provision for amortization where he holds wasting property. Restatement of Trusts, Sec. 239." (Emphasis supplied.)

The Court continued, approvingly quoting from 33 Am.Jur., Section 369, as follows:

" 'The reasons given for the doctrine of amortization from interest coupons are that the fund is certain to be reduced by the amount of the premium at the maturity of the bonds; that that which is really income from a bond purchased at a premium and payable at a fixed time is not the amount received in interest annually, but rather that amount, minus the sum necessary to restore, at the maturity of the bond, the premium paid; and a part of the amount received annually in interest is a return of the principal.' "

The Court reviewed many cases upon the general subject and recognized that cases to the contrary can be found, but concluded that the rule stated is the law of Missouri. Though the "wasting assets" involved in that case were the intangible premiums paid for bonds, rather than physical assets consumed in normal operations of a trust's business, the principles applicable to the two species of wasting assets are not different, and the case is precisely in point.

Estey v. Commerce Trust Co., 333 Mo. 977, 64 S.W.2d 608, 610, was an action to construe a testamentary trust which directed the Trustee to pay "the net income derived from my three houses" to named persons for their lives and to thereafter convey the remainder to others. The Court observed that "the will in question creates the relation of life tenant and remainderman and makes the three plaintiffs mentioned life tenants of the income of the trust estate conveyed by the will to defendant trust company", and that "the question [is] what expenditures are properly chargeable against such income and thereby against the life tenants, and what are chargeable against the corpus of the estate and thereby against the remaindermen."

Answering that question, the Court said, 64 S.W.2d at page 616:

"The general rule is that expenditures should be charged against the person or estate benefited thereby. If both the life tenant of the income and the remainderman are benefited, the expenditures may be apportioned. Reyburn v. Wallace, 93 Mo. 326, 3 S.W. 482. Ordinary annual taxes are chargeable to the life tenant, Houchin v. Hobbs, Mo.App., 34 S.W.2d 167; Schowe v. Kallmeyer, 323 Mo. 899, 20 S.W.2d 26, but assessments for permanent improvements may be charged proportionably against each, 21 C.J. 957; Reyburn v. Wallace, supra, and such is the rule with reference to improvements themselves, 21 C.J. 953, 954; William R. Bush Construction Co. v. Withnell, 190 Mo.App. 33, 43, 175 S. W. 260. 'The duties of a life tenant * * * are to pay the taxes, interest on incumbrances (but not the incumbrance), temporary repairs, a proportionate part of permanent improvements,' etc. Fuller v. Devolld, 144 Mo.App. 93, 128 S.W. 1011, 1012."

■ It would seem that these cases settle the law in Missouri to be that a Trustee who, like the one here, is required to operate a business for a trust in which both life income beneficiaries and remaindermen are interested, is fully justified (unless otherwise directed by the terms of the instrument) in setting up an annual depreciation to cover ordinary and usual wear-out of assets used in the trust's continuing business, and in charging that depreciation against the gross receipts to determine "net income" distributable to life income beneficiaries, and, in these circumstances, it cannot be said that he acts arbitrarily when he does so.

Such is also the general rule. In addition to the numerous cases cited in the Missouri decisions above-mentioned, see In re Bailey's Trust, 241 Minn. 143, 62 N.W.2d 829, 834; Industrial Trust Co. v. Parks, 57 R.I. 363, 190 A. 32, 109 A.L.R. 220; Holmes v. Hrobon, 158 Ohio St. 508, 110 N.E.2d 574, same case in lower court, 93 Ohio App. 1, 103 N.E.2d 845, 865; In re Jones, 103 N.Y. 621, 9 N.E. 493; Mississippi Valley Trust Co. v. Buder, 8 Cir., 47 F.2d 507, 509; In re Robinson, 1951, 3 Dominion Law Reporter 241 (which makes a particularly lucid statement of the rule and the reasons for it), and American Law Inst., Restatement of the Law of Trusts, Sec. 239, where it is said "Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary is wasting property, the Trustee is under a duty to the beneficiary who is entitled to the principal, either (a) to make provision for amortization, or (b) to sell such property", and that "wasting property consists of such interests as terminate or necessarily depreciate in the course of time either because of the nature of the interest or because of the character of the subject matter of the interest" and includes "interests in things which are worn out by use such as machinery and farm implements." Scott on Trusts makes practically the same statement, 1939 Ed., Vol. 2, p. 1332, Sec. 239.

There are cases which, upon first reading, seem to hold to the contrary. Appellee has cited them. We have studied every one. We find that they are either tax cases and governed by particular statutes and rules respecting taxation under which even capital gains, if "distributable", are taxable as income, or are cases involving trusts holding the capital stock of operating companies which themselves take depreciation on wasting assets, and to permit the Trustee to take further depreciation on the stocks in the trust would be to pyramid the depreciation, or are cases in which the trust instrument gave the life income beneficiary the right to invade corpus, or are cases wherein royalties or insurance renewal commissions were made payable to a trust and all of which was income and

distributable to income beneficiaries, or are cases depending upon local law or interpretation of peculiar provisions of the instrument [1], but none of them involved a trust which, like this one, was engaged in carrying on a business and wearing out its property in the production of income, and for the several stated reasons those cases are not applicable.

It should, indeed, be obvious that a Trustee who annually pays out to life income beneficiaries the whole amount produced by a machine, operated and being worn out by the trust, without charging depreciation to cover the wear-out of the machine, is paying to such beneficiaries not only the net income from the machine, but is also paying them annually an aliquot part of the value of the machine itself, for although repairs may postpone, they cannot prevent, the eventual total depletion of the asset. One cannot profitably elaborate a truth so certain and so simple.

Statements by the trial Court, in the course of the trial and in his memorandum opinion, indicate that he felt that plaintiff was, in effect, a co-Trustor, and that if she had not signed this trust instrument she would have gotten an undivided half of her husband's estate under the Missouri law, inasmuch as they had no children, and that, perhaps, she had made a mistake of judgment in signing the trust instrument, and, hence, should be dealt with more "liberally"

than other life income beneficiaries of the trust. This seems to have been the underlying basis of his action. But, plaintiff did sign the instrument, and has never sought, and does not here seek, its vacation, but, on the contrary, both she and her counsel several times during the trial disavowed any such purpose, and she has taken benefits under the instrument for about twelve years, and, of course, cannot take both under it and against it. Nor, incidentally, was there any basis for the Court's holding that the several life income beneficiaries were entitled to the different treatment that "net income", as used in the instrument, means one thing for one life income beneficiary, the plaintiff, and the opposite for the others; and the effect of the Court's holding, in this respect, was to give the plaintiff one-half the accumulated depreciation as income, and to freeze the other part—to which the other life income beneficiaries would be equally entitled—into the trust as corpus, and to allow the plaintiff income on that part for the remainder of her life. This, under the terms of the Indenture, could not logically be justified.

We hold that the Trustee did not arbitrarily or unreasonably exercise the discretion, given him by the trust instrument, in setting up depreciation on the assets of this trust that were being worn out in the contemplated continuance of the trust's business, and in charg-

---

1. Including, among others, Freuler v. Helvering, 291 U.S. 35, 54 S.Ct. 308, 78 L. Ed. 634 (a tax case); Commissioner of Internal Revenue v. Freuler, 9 Cir., 62 F.2d 733 (a tax case); Laflin v. Commissioner of Internal Revenue, 7 Cir., 69 F.2d 460 (a tax case); Whitcomb v. Blair, 58 App.D.C. 104, 25 F.2d 528 (a tax case); United States v. Blow, 7 Cir., 77 F.2d 141 (a tax case); Rossi v. Davis, 345 Mo. 362, 133 S.W.2d 363, 125 A.L.R. 1111; Cadbury v. Parrish, 89 N.H. 464, 200 A. 791; Nelligan v. Long, 320 Mass. 439, 70 N.E.2d 175, 170 A.L.R. 126, and In re Koffend's Will, 218 Minn. 206, 15 N.W. 2d 590 (in each of which the trust owned the common stock of a corporation which itself took the depreciation); Dexter v. Dexter, 274 Mass. 273, 174 N.E. 493, 77

A.L.R. 750 (wherein the trust consisted of periodic receipts of the net income from another trust and was all net income and depreciation was not involved —case distinguished in Industrial Trust Co. v. Parks, 57 R.I. 363, 190 A. 32, 109 A.L.R. 220; Guthrie v. Crews, 286 Mo. 438, 229 S.W. 182 (wherein the beneficiary had the right not only to income, but, as well, to invade corpus); Evans v. Ockershausen, 69 App.D.C. 285, 100 F.2d 695, 128 A.L.R. 177; Buckingham v. Morrison, 136 Ill. 437, 27 N.E. 65; Saulsberry v. Saulsberry, 162 Ky. 486, 172 S.W. 932, and Burgin v. Patch, 312 Mass. 219, 44 N.E.2d 684 (cases depending upon local law or the peculiar terms of the trust.)

ing such depreciation against the gross in determining "net income" distributable to life income beneficiaries. Rather, the Trustee acted well within the discretion given him by the Indenture in so doing. The trial Court's judgment on Count I was, therefore, erroneous and must be, and is hereby, reversed.

We now deal with the judgment on Count III. The question is whether the Trustee arbitrarily exercised his discretion in charging against income, rather than to principal, the unamortized value of the trust's interest in the diesel engine and hammermill, accidentally destroyed twelve days after the beginning of the trust, amounting to $7,084.61, and the fire damage to the roof of a tenant house, amounting to $213.75, and the burglary loss of cash from the store, amounting to $2,499.40, aggregating $9,747.74, and whether the Court was right or wrong in directing payment of one-half that sum to the plaintiff.

The diesel engine and hammermill were capital assets, and properly were being depreciated and amortized over the period of their useful lives. Normally, in an ordinary business, where rival rights of income beneficiaries and remaindermen are not involved and only the one interest of the owner is concerned, it is customary and sound accounting practice to capitalize such assets and depreciate them over the period of their useful lives, but if such property be destroyed, before fully amortized, the unamortized value is immediately expensed, because it would be idle to continue to carry on the books, and to annually depreciate, a non-existent asset.

■ But, where, as here, there are two interests—one in income for life and the other in remainder—those principles cannot be held to apply, but only so much of the capital asset as is consumed in the production of income for the income beneficiaries is properly chargeable against income, and, in such a case, the unamortized value of the property, at the time of its destruction, should be charged to principal.

The same rule applies with respect to the fire damage to the roof of the tenant house, unless so inconsequential as to be properly classed as a repair.

Upon these principles the Court was right in holding that the unamortized value of the destroyed engine and hammermill, and the fire damage to the tenant house—all capital assets—should not have been charged against income, but against principal, unless the Trustee's discretionary determination to the contrary was not arbitrary and, thus, not disturbable by the Court.

In view of the fact that these were clearly capital assets, and of the fact that the life income beneficiaries can derive no benefit from them after destruction, and, hence, the destruction was actually a clear capital loss, we believe there was room, in this intricate situation, for the Court to find that the charging of these losses of principal assets to income was actually so unrealistic as to be sufficiently arbitrary, in the law's regard, to justify the court's action in ordering one half of that loss ($3,649.18) to be paid to the plaintiff from the principal of the trust, and this much of the judgment on Count III is affirmed.

■ But so much of the Court's judgment as held that other life income beneficiaries were not entitled to like treatment was clearly wrong, for the reasons above-stated, and is reversed, as those other life income beneficiaries must be left free to seek the same treatment if they be so advised.

■ But we think other principles control the burglary loss of cash from the store. The store, as a unit of the trust, carried an inventory of goods for retail sale to customers in the ordinary course of business. That inventory was ordinary and non-capital in character and not subject to an allowance for depreciation. The stolen cash was the proceeds of sales from that inventory, and included both the return of cost and the margin of profit, and may be likened to the sale of the same goods for the same

amount on credit which proved uncollectible. Such theft or credit loss is a risk of the business and, therefore, an ordinary operating loss of the business, and must be deducted from gross income in determining the "net income" of the business.

Upon these principles, we think the Trustee acted well within his discretion, and not arbitrarily, in charging the burglary loss against gross income of the store in arriving at "net income" therefrom, and that the trial court was wrong in ordering one half of that loss ($1,224.-70) paid to the plaintiff and charged to the corpus of the trust, and that portion of the judgment on Count III is reversed.

We now deal with the judgment on Count IV. The Court, in effect, held that the annual premium payments of $2,285.00, made in each instance from the principal of the trust, upon the insurance policy on the life of the Trustee for the benefit of the trust—aggregating to the time of this accounting $25,135.00, and giving the policy a cash value at that time of $23,700.00—was not an authorized nor proper investment of the trust's funds, and that if this money had been used for the production of income it would have yielded as much as 6% net annually, and that plaintiff would have been entitled to one-half of that net income and, upon that theory, the Court ordered the Trustee to pay to the plaintiff one-half of 6% compound interest on those annual premiums over all past years, which amounted to $6,720.33, and to charge the payment to the corpus of the trust; but the judgment said that other life income beneficiaries could not have the same treatment.

The Trustee's principal justification for taking out the insurance was that he was the "key man" of the business, and that his long experience in its successful operation made his services of peculiar value to the trust, and that those services would be lost to the trust in the event of his death, and that it was good business to insure his life in favor of the trust—just as similar businesses ordinarily insure the lives of their key men —especially if the premiums be paid from principal and not from income of the trust, so that in the event of his death, during the continuance of the trust, there would be $100,000 more in the corpus to produce income to the life income beneficiaries, and to go to the remaindermen at the termination of the trust.

In Holmes v. Hrobon, 158 Ohio St. 508, 110 N.E.2d 574, 585, the Supreme Court of Ohio dealt with a like question. There the Trustee, as contemplated by the trust, was operating an extensive laundry and linen supply business in Columbus, and being the key man of the business and feeling that his death would result in loss to the trust, he insured his life in favor of the trust in the amount of $75,-000, and paid the premiums from the *income* of the trust. That action was assailed by life income beneficiaries. The Supreme Court of Ohio pointed out that the expenditures were for a non-legal investment under the Ohio statute, but, nevertheless, approved them, saying, 110 N.E.2d at page 585:

"The next item of 'other charges' to be considered is the cost of a $75,-000 insurance policy on the life of the trustee. We do not consider this expenditure authorized under Section 10506–41, General Code, which controls investments by fiduciaries. We, however, approve the expenditure as an item of operating expense. Harry B. Holmes was peculiarly valuable in the operation of the business. It is common practice to insure the lives of key men in a business organization, and to charge the cost of such insurance as an expense of doing business."

We are not prepared to hold that a trustee, of a trust which is operating a business, may not, in proper circumstances, insure his life in favor of the trust, at the expense of the trust; for when a trustor puts a trustee in possession of a business and directs him to operate it, it must be presumed, unless otherwise stat-

ed, that the trustor intended the trustee to do those things for the success, benefit and protection of the business which are commonly done in such businesses by successful private operators; and any contrary holding would logically mean that an officer or director of a corporation could not insure his life in favor of his employer, at the latter's expense, for an officer or director of a corporation is, in fact, a trustee.

But in the peculiar circumstances here, and particularly in the light of the fact that the Trustee was a 60% remainderman of the trust, and of the fact that the plaintiff, upon whose death the trust ends, was 69 years old and the Trustee was only 42 years old at the time of the trial, and thus quite likely to outlive the plaintiff, in which event the plaintiff would never derive any benefit from the investment in this insurance, and in the complex of the total situation in this case, and despite the generally sound holding in Holmes v. Hrobon, supra, we believe there was an adequate equitable basis to support the Court's judgment directing the Trustee to pay to the plaintiff one-half of 6% compound interest on the amount of the premiums paid on this policy in past years, or the sum of $6,-720.23, and to charge the payment to the corpus of the trust; and that much of the Court's judgment on Count IV should be, and is hereby, affirmed.

But so much of the Court's judgment on that count as held that other life income beneficiaries of the trust could not have like treatment was wrong and must be, and is hereby, reversed, as those other life income beneficiaries must be left free to seek the same treatment if they be so advised.

We now deal with the judgment on Count XI. This count sought removal of the Trustee. The Court found that though the Trustee had not been guilty of bad faith, breach of trust, or "any act of dishonesty", and should not be removed, he did have rival interests in the trust, being both a 20% income beneficiary and a 60% remainderman, and was "in the position of trying to serve two interests", and because of this and the fact that, since 1952, the Trustee had not been devoting a major part of his time to the personal operation of the trust [but had spent most of his time in California—partly in working out collection of the sale price of the trust's Gin No. 2, of $70,000—and had spent only about three months of each year on the trust's premises in personal operation of its business, and, when absent, only directed operations by weekly telephone communications and by correspondence, but had, in that period, drawn no salary as the personal operator of the trust's business] the Court felt that the Trustee had, "for the purpose of active management of the trust, abandoned it", and that a co-Trustee should be appointed, and the Court's judgment did that.

Defendants complain, saying that, under the special and specific terms of the trust instrument in this respect, the Court was without power to appoint a co-Trustee, and that, in any event, the evidence shows no need or reason for a co-Trustee.

The Trustor made George Hunter Raffety Trustee. The Trustor also made him a 20% income beneficiary and a 60% remainderman. The Trustor, thus, intended that George Hunter Raffety, as Trustee, should "serve (the) two interests" of income beneficiaries and remaindermen. Surely this was within the right and power of the Trustor to do, and the Trustee's acceptance and performance, in good faith, can afford no basis for criticizing him.

Nor did the Trustor intend or provide that the Trustee would necessarily devote his full time to the personal management of the trust's business, or that failure to do so would constitute an "abandonment" of the trust. Rather the Trustor provided to the contrary by saying "for actual management of the business of the trust estate *to which the Trustee devotes the major part of his time* (the Trustee is to have) a reasonable salary", otherwise not. The Trustee was not required to spend "the ma-

jor part of his time" in the personal management of the trust's business, and the fact that he has not done so since 1952 cannot rightly be said to have constituted his "abandonment" of the trust.

Did the Court have power, under the provisions of this Indenture, to appoint a co-Trustee? The Trustor provided, in the trust instrument, not only that the trust's business is to be "continued after his death", but that it is to "remain in charge of persons competent to manage and preserve same", and that he deemed George Hunter Raffety to be "capable of continuing the management and growth" of the trust's business. The trust instrument further provides that if George Hunter Raffety "deems it to be for the best interest of the trust estate * * * (he shall) appoint as co-Trustee hereunder any person who he may deem suitable." These are valid and enforcible contractual provisions, Sec. 108.3, p. 792, Vol. 1, Scott on Trusts, 2d Ed. and numerous cases there cited, and the Courts are not at liberty to ignore them and to substitute their will for that agreed upon by the parties.

In Riggs v. Moise, 344 Mo. 177, 128 S.W.2d 632, 634, the Court pointed out that "One who creates a trust has the freedom of choice and complete power to name his trustee so long as such trustee possesses the proper legal qualifications", and that "No procedure in any court for the confirmation of the appointment of a trustee so named is compelled in Missouri, as it is in some states, as a condition precedent to a trustee entering upon the performance of his duties", and then, addressing itself to the precise point of whether a Court may appoint a Trustee when, as here, the office is not vacant, the Court said, 128 S.W.2d at page 635:

"Nothing in his [the trustee's] conduct indicated an intention to decline the appointment as trustee and the record discloses nothing had intervened to require in any way a confirmation of his appointment. There was no vacancy. Under such circumstances the application to Division No. 3 did not invoke its jurisdiction, and the appointment by it was a nullity. * * * Perry also says that an appointment by a court of a trustee where there is no vacancy, the former trustee not having relinquished the trust nor been deprived of it for abuse or mismanagement, is a nullity. Perry on Trusts and Trustees, 7th Ed., Sec. 277. The court cannot 'prevent or promote the transmission and vesting of the title of estates devised in trust, in those who are named trustees.' Parker v. Sears, 117 Mass. 513."

"The Court cannot properly appoint a Trustee if by the terms of the trust the power to make the appointment is conferred upon a person who is able and willing to make the appointment", Sec. 108.2, p. 790, Vol. 1, Scott on Trusts, 2d Ed. (citing Illinois, Massachusetts, Michigan, Ohio and Pennsylvania cases). Courts may determine whether a discretion or power exists in a trustee but, if it does, they may not exercise it. Mercantile-Commerce Bank & Trust Co. v. Morse, supra, 201 S.W.2d at page 923.

We recognize the distinction between appointing a sole Trustee and appointing a co-Trustee, and we recognize, too, that generally a Court, after its equity jurisdiction has been invoked in respect of a trust, may, absent express or implicit provisions in the instrument to the contrary, appoint an additional or co-Trustee, even though there is no vacancy in the office of Trustee, where such appointment appears to be conducive to the better administration of the trust, Sec. 108.2, p. 791, Vol. 1, Scott on Trusts, 2d Ed. But the Court can do this only if the parties have not validly contracted otherwise. Here, the parties did contract otherwise. Their contract says that if George Hunter Raffety "deems it to be for the best interests of the trust estate, (he) shall * * * appoint as co-Trustee hereunder any person who he may deem suitable." This covenant fully covers the subject

and deprives the Court of any right to perform that function, or to substitute its will for that of the contracting parties.

Of course, the Trustee may not act arbitrarily in the exercise of this power, nor abuse his discretion in that regard, and if he has so acted, or should so act, the Court would have power, upon proper findings, to interfere. But here there is no evidence or finding that the Trustee is not able, or even that he is unwilling, to appoint a competent co-Trustee of his selection, as contemplated by the trust instrument, if one is needed; and, in these circumstances, it is clear that the Court was without power to appoint a co-Trustee of his own selection, and so much of the Court's judgment on Count XI as did so was wrong and must be, and is hereby, reversed.

Nothing which has been said in this opinion is to be taken as an indication that we have in any way departed from, or disregarded, the rule that where a trial judge has reached a permissible conclusion as to a doubtful question of local law, this Court will accept his considered views. See and compare Buder v. Becker, 8 Cir., 185 F.2d 311, 315. In the instant cases we have been careful to sustain the conclusions of the trial Court so far as we think they can be sustained under Missouri law.

The judgment on Count I is reversed. The judgment on Count III is reduced to, and affirmed in the amount of, $3,-649.18, but is reversed insofar as it held that other life income beneficiaries of the trust were not entitled to seek or receive like treatment. The judgment on Count IV is affirmed, except insofar as it held that other life income beneficiaries of the trust were not entitled to seek or receive like treatment and in that respect it is reversed. The judgment on Count XI, insofar as it appointed a co-Trustee, is reversed.

In view of the foregoing dispositions, appellee's motion to tax costs of printing supplemental record in this Court is overruled.