.Robert Lee MOODY et al., Appellants,

v.

Paul R. HAAS et al., Appellees.

Paul R. HAAS et al., Appellants,

v.

Shearn MOODY, Jr., et al., Appellees.

Nos. 710, 723.

Court of Civil Appeals of Texas, Houston (14th Dist.).

April 4, 1973.

Rehearing Denied April 25, 1973.

John M. O'Quinn, W. James Kronzer, Kronzer, Abraham & Watkins, Richard B. Miller, John L. Hopwood, II, Baker & Botts, Houston, Robert W. Alexander, V. W. McLeod, McLeod, Alexander, Powel & Apffel, Galveston, for Moody and others.

Richard P. Keeton, Travis C. Broesche, Vinson, Elkins, Searls, Connally & Smith, Houston, Charles G. Dibrell, Jr., G. William Rider, Dibrell, Dibrell, Greer & Brown, Galveston, John L. Hill, Atty. Gen., Larry F. York, First Asst. Atty. Gen., Robert B. Davis, Robert L. Lemens, Austin, for Haas and others.

TUNKS, Chief Justice.

In 1942 W. L. Moody, Jr. and his wife, Libby Shearn Moody, executed an instrument by which was established The Moody Foundation. The Moody Foundation as so established exists in perpetuity as a charitable trust for the furtherance of "religious, charitable, scientific and educational uses" within the State of Texas. The trust instrument provides for its administration by three trustees. The three original trustees named in the instrument were W. L. Moody, Jr. (himself), Mrs. Mary Moody Northen, a daughter of the settlors, and Mr. A. A. Horne, a business associate of Mr. Moody.

It is apparent that the settlors established the Foundation as an entity to which

they might leave by will the bulk of their estates. Mrs. Libby Shearn Moody died in 1943. Her will created a testamentary trust to which she left a substantial part of her estate. Under the terms of that trust the income from the property so bequeathed shall go to Mrs. Northen, and to Robert L. Moody and Shearn Moody, Jr., two grandsons, so long as they live. The remainder, after their death, is to go to the Foundation. The Moody National Bank is the trustee named in Mrs. Moody's will. The principal asset in Mrs. Moody's estate was approximately one-third of the outstanding shares of stock in American National Life Insurance Company.

Mr. W. L. Moody, Jr. died in 1954. By his will he left the bulk of his estate to The Moody Foundation. The principal asset of his estate, too, was an approximate one-third of the shares in American National. His estate also included a controlling interest in the Moody National Bank. Other assets included hotels, mineral interests, interests in several ranches and various securities. At the time of the trial the assets of The Moody Foundation were estimated to have a value of about $130,000,000.

After the death of W. L. Moody, Jr. his estate was in litigation for some time so that its assets were not available to the Foundation for the making of grants. After that litigation ended and the assets became so available the Foundation began making large grants in the accomplishment of its purpose. At the time of the trial those grants amounted to about $6,000,000 a year.

Mr. A. A. Horne, one of the original trustees, resigned in 1953. The trust instrument provided that vacancies on the board of trustees should be filled by appointment by a majority of the remaining trustees. Acting pursuant to that agreement W. L. Moody, Jr. and Mary Moody Northen appointed Louis Dibrell to fill the vacancy created by Mr. Horne's resignation.

When W. L. Moody, Jr. died in 1954 Mr. Dibrell and Mrs. Northen, instead of merely filling the vacancy thereby created, voted to appoint three additional trustees. Those so named were Shearn Moody, Jr., W. L. Moody, IV and A. J. Newman. Thus the board was increased to five trustees instead of three as provided in the trust instrument.

In 1954 Louis Dibrell resigned and no new trustee was appointed. In 1955 A. J. Newman resigned. Thereupon Robert L. Moody was appointed.

The board thus constituted four members in 1957 when there came up for consideration the appointment of Dan Moody, a former governor of Texas, as trustee. The four members divided two to two on the issue. That stalemate brought about the intervention of the Texas Attorney General into the affairs of the Foundation. The Attorney General filed suit asking that the court render judgment by which the board of trustees of The Moody Foundation be increased to nine members. After negotiations relating to that suit and other pending litigation it was agreed by the interested parties that the board should consist of seven members. Also by agreement J. Sayles Leach, S. Marcus Greer and J. M. Lykes, Jr. were appointed as trustees in 1959. The Attorney General's suit was thereupon dismissed. In 1965 Mr. Leach died and in 1966 Paul Haas was appointed to the board. There has been no change in the membership of the board since that time.

In October, 1970 the members of the board received notice that a meeting was to be held at which consideration would be given to a proposal that the membership of the board again be increased.

Thereupon Shearn Moody, Jr. filed the suit which led to these appeals. In that suit he asked that the proposal to increase the number of trustees be enjoined. He also challenged the validity of prior increases and trustee appointments. He named as defendants the other six individ-

uals claiming to be trustees of The Moody Foundation and the Attorney General of the State of Texas.

The Attorney General was made a party defendant pursuant to the provisions of Vernon's Tex.Rev.Civ.Stat.Ann. art. 4412a (1966). He filed a cross-action contending that if the court found the board's own action in increasing its number above three to be invalid, then the court should itself order an increase and should appoint trustees to the new positions on the board so created. He requested that in the public interest the number of trustees be increased to nine. He also asked that all action taken by the board during the time that it acted through more than three members be validated.

Messrs. Haas, Greer, Lykes and W. L. Moody, IV adopted the position taken by the Attorney General including a proposal that, if the board membership be increased by the court, they be reappointed as trustees.

Paul Haas also contended that, regardless of the holding of the court as to the validity of the board's action in increasing its size, he was, nevertheless, validly appointed.

Robert L. Moody took a position consistent with that taken by the plaintiff, Shearn Moody, Jr. Robert L. Moody also contended that his appointment to the board was valid despite the fact that the board could not increase its number above three. Both Shearn and Robert L. Moody have taken the position that, if the court was to order an increase in the size of the board, then those now validly members should make the appointments filling the newly created positions.

The other named defendant, Mrs. Mary Moody Northen, took no position in her pleadings except to deny any personal liability. At one point during the trial her attorney stated that it was her request that the size of the board not be increased or, at any rate, not beyond five members.

The case was tried without a jury. There were seven separate hearings held in the trial court at which a record was made of the proceedings. The statement of facts shows that the first of those hearings began on November 11, 1970. The last began on March 7, 1972. By this procedure separate issues in the controversy were tried separately. From time to time during the proceeding the trial judge announced his holding upon a particular issue that had been so tried. Those various holdings were ultimately incorporated into one final judgment.

The trial court's judgment may be summarized as follows:

1. All actions taken by the board at a time when there purported to be more than three members are validated insofar as their validity may be questioned because of the fact that more than three purported members participated.

2. The board, itself, did not have the power or authority to increase its membership to more than three members.

3. The court did have the power and authority to increase the membership of the board and by the rendition of judgment it was so increased to seven members.

4. The court, and not the valid members of the existing board, had the power and authority to appoint the persons to fill the memberships created by that portion of the judgment that increased the size of the board. The court will make those appointments after the judgment becomes final and non-appealable.

5. Mrs. Northen and Robert L. Moody validly hold membership on the board by virtue of appointment in accordance with the provisions of the trust instrument.

6. Mrs. Northen and Robert L. Moody, as remaining valid members of the three member board created by the trust instrument, have the power and authority to fill vacancies that occur by virtue of

the deaths or resignations of the original three members or their successors. That is to say, under the court's holding Mrs. Northen and Robert L. Moody would appoint one member to the board.

7. Neither Paul Haas, S. Marcus Greer, J. M. Lykes, W. L. Moody, IV nor Shearn Moody, Jr. is a valid member of the board.

Pursuant to agreement of all parties the membership of the board as it existed at the beginning of this suit has continued to act and will so continue until the final disposition of this case.

Shearn Moody, Jr. and Robert L. Moody have appealed from the trial court's judgment. By such appeal they attack those holdings listed as numbers 3 and 4 above. Their basic position is that the court had no power and authority to increase the size of the board from three to seven members. Alternatively, they contend that if the board's size is to be increased then the existing validly appointed members, and not the court, should make the appointments filling the vacancies created by such increase. The appeal raising those questions will be referred to herein as the Shearn Moody, Jr. appeal.

Paul Haas has separately appealed. By his appeal Mr. Haas contends that the trial court erred in holding that his membership on the board was not valid. Alternatively, Mr. Haas contends that if his membership is not valid then neither is the membership of Robert L. Moody. The appeal raising those questions will be referred to as the Paul Haas appeal.

Neither of the two appeals raises any questions as to the trial court's holdings listed above as numbers 1 and 2.

## THE SHEARN MOODY, JR. APPEAL

The language of the instrument by which The Moody Foundation was created rather clearly shows that the settlors intended that it should be administered by three, and only three, trustees. This is true despite the fact that there is no language in it that specifically limits the board to three members. The trial court held that the instrument did not empower the trustees, themselves, to increase their number. As noted, that holding is not challenged in either of these appeals. There is nothing in the language of the instrument that specifically empowers a court or any other entity to enlarge the board. The instrument provides that vacancies on the board shall be filled by the "remaining" members. This provision indicates that the settlors expected vacancies to occur by death, resignation or removal and not by an enlargement of the board. The procedure to be followed in the filling of vacancies also is significant. The procedure provides that the newly appointed member shall execute a written acceptance in four copies, one to be kept by each member of the board and one to be filed in the office of the County Clerk of Galveston County, Texas. The original trust instrument was executed in four originals. Each trustee was furnished with one of those originals and the other was to be filed with the County Clerk. It was provided that as successor trustees were appointed each was to be furnished with the original copy of the trust agreement that had been held by the trustee whom he succeeded. Such provisions are inconsistent with an intent on the part of the settlors that there might be more than three trustees. The first question presented in· the Shearn Moody, Jr. appeal then is whether a court is empowered and authorized to enlarge the board despite the settlors' intent that it be constituted of three members.

Under Texas law a court in the exercise of its chancery powers can intervene in the administration of a charitable trust. Boyd v. Frost Nat. Bank, 145 Tex. 206, 196 S.W.2d 497 (Tex.Sup.1946). Such intervention, however, is done not in disregard of the intention stated by the settlor in creating the trust, but in lending the court's powers to the accomplishment of

that intention where such assistance is needed. In the Boyd case, supra, the validity of a bequest for charitable purposes was questioned upon the ground that it did not sufficiently identify the intended objects of the charity. The Court held the bequest to be valid and that it could be effectively administered with the assistance, if needed, of the equitable powers of a court. In so holding the Court said, at page 501, "The courts should be most unwilling to disappoint the expanse and magnificence of her (the settlor's) vision by frustrating the wishes she has thus plainly expressed." Among the functions that will be done by a court in the exercise of its general supervisory powers over a charitable trust are the prevention of devoting the trust to an unauthorized purpose, the compulsion of a recusant trustee to act, the removal of a faithless trustee, the filling of a vacant trusteeship where the settlor has not provided a means·for filling such vacancy, the furnishing of legal guidance to trustees as to the administration of the trust, and the giving of general assistance in its administration. Boyd v. Frost Nat. Bank, supra; Powers v. First Nat. Bank of Corsicana, 138 Tex. 604, 161 S.W.2d 273 (Tex.Com.App.1942, opinion adopted); Pierce v. Weaver, 65 Tex. 44 (1885).

The extent to which a court in the exercise of its general supervisory powers over charitable trusts will respect the expressed wishes of the settlor is shown in the following language:

"Courts will not disregard the will of the donor of property conveyed in trust for charitable uses, even in reference to the manner of appointing new trustees, but will leave the beneficiaries to pursue the method pointed out by the donor in his deeds, unless facts be shown which make such action necessary to carry out the will of the donor.

Courts only appoint trustees to administer such trusts when a power to create them in some other way has not been provided, unless under facts exceptional in character."

Pierce v. Weaver, supra, 47 and 48.

There are certain circumstances wherein a court will exercise special supervisory functions in addition to its general supervisory functions. Thus, where the particular charitable purpose for which the trust was created becomes impossible of achievement or illegal or impracticable, the trust does not fail·if the settlor has shown a general intention that his property shall be used for charitable purposes. In such a situation the court will exercise its cy pres power and adjudge that the property be applied to some other particular charitable purpose falling within the general intention of the settlor. In selecting the other particular charitable .purpose the court will choose that which is near as may be to the one designated by the settlor. Coffee v. William Marsh Rice University, 408 S. W.2d 269 (Tex.Civ.App.-Houston 1966, writ ref'd n. r. e.); IV A. W. Scott, The Law of Trusts sec. 399.2 (3d ed. 1967); Restatement (Second) of Trusts sec. 399 (1959). No party here contends that that doctrine is applicable to this case. It is mentioned because it demonstrates the court's adherence to the proposition that in administering charitable trusts the settlor's expressed intention should be followed as nearly as possible.

Another rule permitting a departure from the expressed intention of the settlor of a charitable trust is stated at section 381 of Restatement (Second) of Trusts, as follows:

"§ 381. Deviation from Terms of the Trust

The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or sub-

stantially impair the accomplishment of the purposes of the trust."

This rule relates to changes in the methods prescribed by the settlor for accomplishing the purposes of the trust. It is to be noted that the language of this rule is rather restrictive and permits departure from the settlor's prescribed scheme of administration only under extraordinary circumstances. See Amalgamated Tr. U., Loc. Div. 1338 v. Dallas Pub. Tr. Bd., 430 S. W.2d 107 (Tex.Civ.App.-Dallas 1968, writ ref'd n. r. e.), cert. denied 396 U.S. 838, 90 S.Ct. 99, 24 L.Ed.2d 89 (1969).

While the Attorney General and the Haas group of trustees rely on the deviation rule mentioned in the above paragraph as a basis for supporting the court's increasing the number of trustees, they do so only alternatively. The principal authority of the court which they propose as supporting such change is stated in the rule set out in section 108 of the Restatement (Second) of Trusts, as follows:

> "§ 108. Appointment of New Trustee
>
> If a trust is created and there is no trustee or if the trustee, or one of several trustees, ceases for any reason to be trustee, a new trustee can be appointed
>
> (a) by a proper court; or
>
> (b) by the person, if any, who by the terms of the trust is authorized to appoint a trustee."

In particular the Attorney General and the Haas group of trustees rely on the Restatement's comment e. which is designated as a comment on clause (a) of the quoted section and reads as follows:

> "e. Appointment of additional trustees. The court can appoint additional trustees, and not merely fill vacancies by appointment, when the circumstances are such that the appointment of such additional trustees would be conducive to the better administration of the trust."

It was with a view of the applicability of those two rules, the deviation rule and the Restatement rule as to the court's authority to appoint new trustees, that we have considered the evidence in this case.

Much of the evidence in this case was documentary. These documents included, of course, the trust instrument by which the Foundation was established. Other documents showed the nature of the trust established by Mrs. Libby Shearn Moody's will. The assets owned by the Foundation were shown by financial statements. The various actions taken by the trustees in making appointments of trustees were shown by copies of the minutes of their meetings. There were written statements showing grants made by the Foundation. Copies of pleadings and orders relating to the litigation involving the Foundation which was instituted by the Attorney General in 1957 were introduced.

Mr. Paul Haas was the only trustee who testified. Mr. Robert E. Baker, executive administrator and secretary of the Foundation, also testified. Those two witnesses explained the organization and operation of the Foundation and the nature of its assets. The staff consists of nine people including Mr. Baker, a grant coordinator and assistant, an accountant and five office personnel. The Foundation receives 5 or 6 hundred applications for grants each year. The staff makes brief written summaries of the applications and furnishes those summaries to the trustees in advance of their meetings. The trustees hold regular meetings nine times a year. There are additional special meetings. In addition to grant-making functions the trustees have the responsibility of managing the assets of the Foundation. Consultants are used in specialized areas of investments, such as in the management of oil and gas property. At the time of testifying Mr. Haas had been chairman of the trustees for three years. He testified that his services to the Foundation required ten to fifteen percent of his time.

Other witnesses presented by the Attorney General and the Haas group of trust-

ees in support of their cross-actions were professionals in the field of management of charitable foundations. They each expressed their philosophies as to foundation management and charities in general. Their expressions of opinion as to the optimum number of trustees for The Moody Foundation varied from nine to twenty. Some expressed the opinion that there should be trustees representative of particular segments of society that were subjects of the charitable purposes of The Moody Foundation. One, an educator himself, suggested that the trustees should include an educator. It was suggested that there should be trustees from the various geographical areas of the State of Texas since the charitable purpose was limited to Texas. Other such representative trustees might include a theologian, a doctor, a lawyer, representatives of minority groups, etc.

The professionals expressed concern over participation in foundation affairs of those trustees who were "family members", the relatives of the settlors. The opinion was expressed that the majority of the trustees should not be "family members". The reason given for this opinion was the fear of possible conflict of interests. The majority of the trustees of The Moody Foundation is now, and at all times has been, made up of family members. It is noteworthy, however, that one of those family members, W. L. Moody, IV, has sided with the Haas group in this lawsuit.

One of the professionals who testified was Mr. David Freeman. He had formerly been associated with The Ford Foundation and The Rockefeller Bros. Foundation. He had made a particular study of the Tax Reform Act of 1969 and its effect on administration of charitable foundations. He had testified before U. S. House and Senate Committees with reference to such legislation. He testified that under the Act a foundation may be required to divest itself of controlling interests in a corporation. The Moody Foundation's control of American National Insurance Company and Moody National Bank might be affected. He said that the act requires disposition of a specified percentage of a foundation's annual income or, alternatively, the annual disposition of a fixed percentage of the market value of its assets. He also testified that before the Reform Act the penalty for violation of tax regulations was the suspension of the foundation's favorable tax status. The Reform Act provides for the imposition of sanctions directly upon the trustees of a charitable foundation. He expressed the opinion that the changes in charitable foundation administration occasioned by this statute created a necessity that The Moody Foundation have the services of eleven to fifteen trustees to effectively manage its affairs.

The parties opposing the expansion of the board also offered expert witnesses. One such witness was a certified public accountant who specialized in the tax problems of charitable foundations. He testified that, regardless of the number of trustees of the Foundation, its problems resulting from the Tax Reform Act of 1969 would have to be handled by outside consultants—accountants and lawyers with special skills and experience. Another witness who was an experienced professional in charitable foundation administration testified that the affairs of The Moody Foundation could effectively be handled with three trustees. It was his opinion that it was the quality of the trustees, and not their number, that was important. He pointed out the trust instrument here involved gave the trustees broad authority in the employment of consultants.

Evidence was offered as to the structure of ten of the leading Texas charitable trusts and foundations. Their size, based on the value of their assets, varied from $200,000,000 to $16,000,000. Six of them, including the five largest, have fewer than seven trustees. As to four of them the majority of the trustees are "family members."

While the record showed a potential conflict of interests of some of the trustees, there is no evidence in this trial even suggesting that those trustees, or any other trustees, have been guilty of any unfair self-dealing or any other wrongdoing. In fact, the Attorney General in a statement to the court which is included in the statement of facts specifically disavowed any contention of trustee wrongdoing. He stated his approval of the court's ruling that Mrs. Northen and Robert L. Moody were valid trustees and spoke approvingly of the services of W. L. Moody, IV as a trustee. Thus there is no evidence of facts that would justify the invocation of the court's general supervisory power as to the removal of faithless trustees.

■ We are of the opinion that there is no evidence of facts that would justify the application of the deviation rule as a basis for departure from the settlors' expressed directions as to the administrative set-up for the accomplishment of their charitable purposes. (An increase of the number of trustees from three to seven is such a departure.) By no construction can the evidence be construed as showing that administration of the trust with three trustees has become "impossible or illegal." Nor is there any showing of any circumstances which were not known to the settlors and not anticipated by them which would defeat or substantially impair the accomplishment of the purposes of the trust if the number of the trustees is not increased to more than three. The principal fact argued as constituting such a circumstance is the enactment of the Tax Reform Act of 1969. Surely it cannot be suggested that a man of the business acumen and experience of W. L. Moody, Jr., whose ability accumulated the wealth for which this trust was founded, did not anticipate that there would be changes in the tax laws. Rather, the language of the trust instrument suggests that the settlors did anticipate that problems of a technical nature would arise because it gave the trustees full authority to procure the help of expert consultants. Neither the lawyers in this case nor we have briefed the details of that statute. Instead they and we have accepted the testimony of Mr. Freeman as being authoritative. As we construe his testimony the statute did not change the basic principles relating to tax exemption of charitable foundations from those principles that existed when this Foundation was established. It merely provided special safeguards to insure the compliance with those principles. In at least one respect, if not in the entirety, those changes to which the witness testified are calculated to assist, rather than make difficult, the accomplishment of the purposes of the settlors. The provision for assessment of penalties directly against the trustee is conducive to their faithful performance of their duties.

Changes that have occurred in the character of the assets of the Foundation since its establishment are calculated to facilitate, rather than complicate, its management. Some of the assets that were troublesome and difficult of management have been disposed of. Several hotels have been sold. Some oil and gas and ranch properties have been sold. At the time of the trial the Foundation was engaged in a program of disposing of other such properties.

There remains for consideration as to the Shearn Moody, Jr. appeal the effect of the rule stated in the Restatement (Second) of Trusts sec. 108, and comment e thereunder. The language of that comment, if taken literally and read out of context, supports the contention that the trial judge in this case was authorized to increase the number of trustees to seven if the evidence sustained his finding that such increase "would be conducive to the better administration of the trust." No findings of fact were requested or filed. The testimony of some of the experts, as summarized above, is consistent with such finding by the trial judge. We must presume that he made such finding if it will sustain his judgment.

The witnesses' testimony in this case as to what is the better way to administer the trust or what is "more conducive" to its better administration, is necessarily opinion testimony. So is the judge's implied finding upon that matter necessarily an expression of his opinion, even though it was supported by the opinion testimony of the witnesses. Thus the implied finding of fact is not a finding of a concrete fact, but is an implied opinion of the trial judge. This is not to suggest that an implied finding of fact which is based upon opinion may not serve as a basis for a judgment, but rather it is meant to demonstrate the intangible nature of the fact finding upon which we are asked to disregard the settlors' directions as to how their trust shall be administered.

It might be argued that the appointment of new trustees in addition to those provided by the settlors' directions is only a minor departure from the settlors' expressed wishes, that such change relates only to the administrative phase of the trust and for that reason such change may be made upon an opinion as to what is better, rather than a finding of what is necessary, to accomplish the settlor's purposes. Such argument would not be persuasive. The selection of the individuals who are to administer the trust may substantially influence not only the manner in which the trust is administered but also the areas of the charitable purpose that will be emphasized. Particularly is that statement true as to this trust because its charitable purpose is so broadly stated that broad discretion is left to the trustee in selecting the objects of the Foundation's grants.

There is another reason why the trial court's proposed change of those settlors' plan of administration is significant. The appointments which the trial court proposes to make would constitute a majority of the trustees. The trust instrument provides that the majority of the trustees are authorized to remove a trustee "for any cause whatever."

The parties in this case have cited numerous opinions from other jurisdictions in support of their positions. Though some of the language of those opinions support the position of the party citing them, none of their holdings are directly in point on the precise question here involved. To demonstrate the lack of persuasion of even the language of those authorities we refer to some of the cases cited.

In In Re Badenhausen's Estate, 38 Misc.2d 698, 237 N.Y.S.2d 928 (Surr.Ct. 1963) there were involved two testamentary trusts. Each trust provided for a single different individual as trustee. Each trustee applied for the appointment of a co-trustee. The court's treatment of those applications is shown in the following quoted language from pages 934 and 935:

"Hans Hinrichs, the trustee of the trust established in Paragraph 'Fourth (a)' of the will and Walter E. Badenhausen, the trustee of the trust established in Paragraph 'Fourth (d)' of the will have petitioned the Court for the appointment of Bankers Trust Company to act as co-trustee. All the adult beneficiaries have consented and the special guardian has not objected. The alternate trustees also have consented and the named trustees have waived commissions.

The application is addressed to the Court's discretion. This discretion seems to have been exercised only rarely and in exceptional cases. Matter of New York Title and Mortgage Company, 150 Misc. 679, 271 N.Y.S. 318, rev'd on other grounds, 241 App.Div. 351, 272 N.Y.S. 553; Matter of Guernsey, 10 Misc.2d 546, 172 N.Y.S.2d 255; Chase v. Russell, 236 Mass. 417, 128 N.E. 712. Professor Scott suggests that the standard of discretion to be applied is whether such an appointment will be conducive to the better administration of the trust. I Scott on Trusts pg. 791; See: Restatement of the Law of Trusts 2d Sec. 108, Comment (e).

No proof has been offered to indicate that the appointment of a co-trustee would be conducive to the better administration of the trust of which Walter E. Badenhausen was named trustee. It is alleged merely that he is semi-retired and does not desire to have the sole responsibility for administering the trust. Any determination by the Court that the trust would be better managed if a co-trustee is appointed would be pure speculation. In Gilbert v. Wise, 192 Misc. 101, 78 N.Y.S.2d 533, where a co-trustee was appointed, the named trustee had been mismanaging the trust as evidenced by the fact that a surcharge was imposed upon him.

Although the Court has extensive powers over testamentary trusts, it cannot lightly ignore the intentions of the testatrix. The identity and the number of trustees are a significant part of the structure of a trust. The testatrix chose one individual trustee, a member of her family, as her trustee. The Court will honor her wishes. The application for the appointment of Bankers Trust Company as a co-trustee of the trust established in Paragraph 'Fourth (d)' of the will is denied.

The trust of which Hans Hinrichs is the named trustee presents a different problem. He is both the sole trustee and the sole beneficiary and unless a co-trustee or a different trustee is appointed a merger of his legal and equitable interests will leave him with a legal life estate. Matter of Reed v. Browne, 295 N.Y. 184, 66 N.E.2d 47. Faced, then, with a destruction of the trust, by operation of law, some modification of the intention of the testatrix is unavoidable."

It will be noted that the court denied the appointment of the first co-trustee in honor of the testatrix's expressed wishes. The second co-trustee was appointed because, absent such appointment, the Court was faced with the destruction of the trust.

Gilbert v. Wise, 192 Misc. 101, 78 N.Y. S.2d 533 (1948) referred to in the above quotation was cited by these appellees.

Another case cited which is inconclusive authority is Selig v. Morrison, 230 Ark. 216, 321 S.W.2d 769 (1959). In that case a testamentary trust was involved in litigation. The trustees could not agree upon the position to be taken in the litigation. The wife of one of the trustees would experience a substantial financial gain if the outcome of the litigation was adverse to the trust's interest. The trial court's appointment of a "trustee ad litem" for the purpose of conducting the pending litigation was approved. In so approving the trial court's action the appellate court said, at page 773:

"It appears that it would be wholly impractical for the testamentary trustees to conduct the litigation. There is a conflict in their personal interests, and the interest of Mr. Selig conflicts with the interest of Foundation, a beneficiary named in the testamentary trust. The trustees disagree sharply on how the case should be conducted. At every step they would have to go to the court for instructions. Actually, the court would be put in the position of having to decide the case to a large extent before it was ever submitted."

In Reagh v. Hamilton, 194 Wash. 449, 78 P.2d 555 (1938) the Court held valid a judgment transferring the management of a trust from a self-perpetuating board of three individual trustees, as provided for in the will creating the trust, to a corporation. In so holding the Court said, at page 558:

"While courts, in construing the provisions of a charitable trust, ordinarily will not deviate from the plan outlined by the testator, they undoubtedly have the power to do so, if it is reasonably necessary in effectuating the primary purpose of the trust. 2 Perry on Trusts, 7th Ed., § 729a. We think the purpose of the trust

will best be subserved by transferring the trust estate and management to a corporation, as provided for in the decree of the trial court. In the decree, it was provided that the board of trustees of the corporation should consist of not less than three nor more than nine members. While the will provides for only three individual trustees, we do not think this provision of the decree does violence to the primary object of the testator."

The quoted language, at least in part, supports the position of appellees.

Other out of state cases cited include, Stone v. Baldwin, 347 Ill.App. 128, 106 N. E.2d 379 (1952); In Re La Rocca's Trust Estate, 419 Pa. 176, 213 A.2d 666 (1965) and In Re Ranck's Estate, 381 Pa. 332, 112 A.2d 105 (1955). The holdings and language of the opinions of those cases are only remotely applicable to the facts of this case.

None of the out of state cases cited by appellants are directly in point. The language of the opinion in Raffety v. Parker, 241 F.2d 594 (8th Cir. 1957) is, however, relevant here, particularly as to whether the potential conflict of interest of these trustees is sufficient basis for the court's appointment of additional trustees. In that case the trust provided for only one trustee and the trustee named by the settlor had a 20% interest in the trust's income and was a 60% remainderman. The Court said, at page 610:

"The Trustor, thus, intended that George Hunter Raffety, as Trustee, should 'serve (the) two interests' of income beneficiaries and remaindermen. Surely this was within the right and power of the Trustor to do, and the Trustee's acceptance and performance, in good faith, can afford no basis for criticizing him."

Other relevant language of the Raffety opinion, at page 611, is as follows:

"We recognize the distinction between appointing a sole Trustee and appointing a co-Trustee, and we recognize, too, that generally a Court, after its equity jurisdiction has been invoked in respect of a trust, may, absent express or implicit provisions in the instrument to the contrary, appoint an additional or co-Trustee, even though there is no vacancy in the office of Trustee, where such appointment appears to be conducive to the better administration of the trust, Sec. 108.2, p. 791, Vol. 1, Scott on Trusts, 2d Ed. But the Court can do this only if the parties have not validly contracted otherwise. Here, the parties did contract otherwise. Their contract says that if George Hunter Raffety 'deems it to be for the best interests of the trust estate, (he) shall * * * appoint as co-Trustee hereunder any person who he may deem suitable.' This covenant fully covers the subject and deprives the Court of any right to perform that function, or to substitute its will for that of the contracting parties."

The holdings and language of other cases cited are of lesser degrees of relevancy to the facts of this case. Those citations include, Andris v. Biehl, 27 Ill.App.2d 393, 169 N.E.2d 692 (1960); Hartman v. Orr, 41 N.E.2d 406 (Ohio App.1941); Mullanny v. Nangle, 212 Ill. 247, 72 N.E. 385 (1904); and Gathright's Trustee v. Gaut, 276 Ky. 562, 124 S.W.2d 782 (1939).

In a "memorandum opinion" dated February 18, 1972 the trial judge states:

"After considerable reflection and study in the matter, I have concluded that due to the size, functions and complexity of the Foundation and for the orderly and effecient (sic) operation of same, the Board of Trustees should be expanded so that it could better cope with the demands of today and the future."

As we have noted the "size" of the Foundation, the value of its assets, is less than when it was established. Its "functions" have been well within the boundaries of the stated purposes of its charity. Its "complexity" is of less degree by virtue of

the disposition of certain properties. There is no evidence of the existence of facts relevant to those facets of the Foundation which would authorize a departure from the settlors' expressed intent as to the structure by which their charity was to be administered.

Giving due consideration to the authorities of the text writers and of other jurisdictions, but with special consideration given to the above cited Texas cases, we are of the opinion that the trial court erred in adjudging that the number of trustees be increased. The settlors clearly expressed their intention that there be three trustees and clearly provided a procedure for maintaining the trustees at such number. There is no evidence of "facts exceptional in character" that authorizes the Court to "disregard the will of the donor(s)." See Pierce v. Weaver, supra. There is no evidence of facts which makes the administration by a board of three trustees, the continuity of whose membership is accomplished by the means provided in the trust instrument, "impossible or illegal." There is no evidence of "circumstances not known to the settlor(s) and not anticipated by him (them)" by reason of which compliance with their wishes would be "impractical or inexpedient" or would defeat or would substantially impair the accomplishment of their charitable purposes. See Amalgamated Tr. U., Loc. Div. 1338 v. Dallas Pub. Tr. Bd., supra. Absent a showing of such facts a court does not have discretion to deviate from the administrative plan provided by the settlors. Such holding is consistent with sound policy. If it were the rule of law of this state that a court could disregard the settlor's plan for administration of a public charity simply because the judge believed that another plan would be better, such rule would substantially discourage the establishment of charitable trusts, or, at least, encourage the settlors to seek other jurisdictions in which to establish them. The adoption of such rule also would upset the stability of many of the charitable foundations that now exist in

Texas. As noted above many of them, including the largest ones, have fewer than seven trustees.

## THE PAUL HAAS APPEAL

A case upon which both parties to this appeal rely to some extent is In Re Stillman's Estate, 53 N.Y.S.2d 718 (Surr.Ct. 1945). The trial court apparently followed the reasoning of that case in ruling on the question of the validity of the appointments of Paul Haas and Robert L. Moody. As noted, the court ruled that Paul Haas was not validly appointed, but that Robert L. Moody was.

In Stillman a testamentary trust was established to administer three separate funds. (There were four funds mentioned in the will but one of them had been distributed to the remainderman and, thus, became immaterial.) The will named four trustees and provided that they should fill any vacancies in their membership. Some of the trustees could not act as such with reference to some of the funds in which they had a personal interest. In 1940 one of the four trustees died. Of the three that were left two had personal interests in two of the funds. The three trustees construed the will as creating three separate trusts of which they were trustees. They undertook to appoint two new trustees, one to act in behalf of each of the two funds of which existing trustees had personal interests. The court held that the three trustees were in error in construing the will as having created three trusts. There was only one trust and only four trustees were permissible. Since the two new men were appointed simultaneously, and since their appointment named more trustees than were permissible, neither was validly appointed.

At a later date one of the validly appointed trustees died. The fund, to which one of the invalid trustees was appointed, thus became distributable and the individual appointed to it no longer purported to be a trustee. At this stage there were two

valid trustees and one who claimed to be a trustee, but whom the court held not to be validly appointed. An instrument subscribed by the two valid trustees "and one other" (not identified in the opinion) named Timothy Goodrich Stillman as a new trustee. The court held such appointment to be valid and also held that the trustees could make another valid appointment to fill the vacant position purportedly held by the invalid trustee.

After the death of W. L. Moody, Jr. in 1954, Mrs. Northen and Mr. Dibrell were the remaining members of the board of trustees at the Foundation. They were valid members. They voted to increase the board to 5 members and simultaneously appointed Shearn Moody, Jr., W. L. Moody, IV and A. J. Newman. The court, following the reasoning of the Spellman case, held that those three appointments were all invalid so that Mrs. Northen and Mr. Dibrell were still the only valid members of the board. No one has challenged that holding in either of these appeals.

■ After Mr. Dibrell's resignation later in 1954 Mrs. Northen was the only remaining valid trustee of the four persons acting as trustees. When Mr. Newman resigned in 1955 Mrs. Northen was the only valid member of the three who were acting thereafter as trustees. The court has held that the reduction of the trustee membership to the number permissible under the trust instrument did not validate the appointments of Shearn Moody, Jr., and W. L. Moody IV. That holding too is unchallenged in these appeals. There were two vacancies on the valid board. It was with the trustee membership in this status that they by resolution appointed Robert L. Moody. The trial court is presumed to have found that Mrs. Northen, the valid remaining trustee, voted for such appointment. The evidence is factually sufficient to support such presumed finding. The trial court then apparently treated the votes of Shearn Moody, Jr. and W. L.

Moody, IV as surplusage and held that the affirmative vote of Mrs. Northen effectively appointed Robert L. Moody as trustee to fill one of the two vacancies on the valid board. We are of the opinion that such holding was erroneous.

Mrs. Northen, when she voted for the appointment of Robert L. Moody, did not thereby intend to appoint him to a vacancy on a three member board of trustees. She intended to appoint him as the fourth member of a four member board. Quite different considerations might be involved in the appointment of one to fill one of two vacancies on a three member board than would be involved in the appointment of one to fill the only vacancy on a four member board. There is no logical distinction between the status of Robert L. Moody as an appointee to a four member board and that of Shearn Moody, Jr., W. L. Moody, IV and A. J. Newman as simultaneous appointees to a five member board. Just as the court held that it could not identify any one of the latter as having been appointed to the then one vacancy, so it could not identify the vacancy to which Robert L. Moody was appointed as having been one of the valid vacancies.

Our holding on this point is not necessarily inconsistent with the Court's reasoning in Stillman, supra. When Timothy Goodrich Stillman was appointed (validly, as the Court there held) it was by an instrument signed by the two valid trustees and "one other" not identified by the opinion. At the time of such appointment there were two who were validly acting as trustees and one acting invalidly. Thus there was a recognized legal vacancy on the four member board. The intent of the valid trustees in appointing Timothy Goodrich Stillman could be identified as an intent to fill the recognized legal vacancy.

We have given consideration to another basis for holding invalid the appointment of Robert L. Moody. When Mrs. Northen voted for his appointment she was not act-

ing individually as the remaining valid trustee. She was acting as a part of what the Court in the Stillman case called a "juridical person", the board of trustees of the Foundation. That juridical person was invalidly constituted in that a majority of its members were not validly appointed. It was because of the questionable validity of the actions of a board so constituted that the parties to this suit sought and procured a ruling of the trial court validating other past actions of the board of the Foundation.

From what has been said it must necessarily follow that the appointment of Paul Haas as trustee was invalid. There are, however, additional reasons for such holding. The minutes of the board meeting at which he was appointed do not show that either Mrs. Northen, whom we have held to be the only valid trustee, or Robert L. Moody, whom the court held also to be a valid trustee, voted for his appointment. Presumably the court failed to find that he had sustained his burden of proving that he received the necessary vote of the remaining valid trustee or trustees. Also the evidence shows that his appointment was to fill a vacancy caused by the death of J. Sayles Leach who, himself, was not a validly appointed trustee.

That portion of the trial court's judgment wherein it was adjudged that the number of trustees of The Moody Foundation be increased from 3 to 7 is reversed and judgment is here rendered that there be three trustees of such Foundation and that vacancies among that number be filled by the remaining validly appointed trustee, Mrs. Mary Moody Northen. That portion of the trial court's judgment wherein it was adjudged that Mr. Paul Haas was not a validly appointed trustee of The Moody Foundation is affirmed. That portion of the trial court's judgment wherein it was adjudged that Mr. Robert L. Moody was a validly appointed trustee of The Moody Foundation is reversed and judgment is here rendered that he was not so validly appointed.