McCORD, Judge.
These are consolidated appeals from a partial final judgment in a declaratory judgment action brought below by all of the trustees under the Last Will and Testament and Codicils thereto of Alfred I. du-Pont, with the exception of William B. Mills, who was made a party defendant since he was not in agreement with the contentions of the other trustees on the questions presented for adjudication. The Will and Codicils of Alfred I. duPont established a trust to be administered by four trustees named in the Will (the Will and Codicils named certain alternates in the event those named as trustees were not living at the time of his death and also provided for the surviving trustees to elect replacements to fill vacancies occurring among the trustees). In 1965 the trustees determined to elect additional trustees and Messrs. T. S. Coldewey and Alfred duPont Dent were elected. Subsequently, in 1967, the then six trustees determined to elect two additional trustees and Messrs. J. C. Belin and W. L. Thornton were elected. It is these additions to the trustees that are in controversy in this phase of the lawsuit. Trustee Mills contends they are invalid, and the remaining trustees contend otherwise. The trial court in the supplemental declaratory judgment which formed the basis for the partial final judgment here on appeal defined the issues tried and determined by that judgment as follows:
“I. Whether Messrs. Coldewey and Dent in 1965, and Messrs. Belin and Thornton in 1967, were validly elected as Trustees?
II.If the Will does not authorize the Trustees to increase the number of individual Trustees without Court authorization, in view of the facts and circumstances existing in 1965 1967, should the Court now expressly approve the actions of the Trustees in electing Coldewey and Dent in 1965, and Belin and Thornton in 1967?
III. Whether this Court has the power to appoint additional Trustees of the duPont Trust, and to confirm their prior actions as Trustees?
IV. Are Petitioners or Defendant Mills precluded from challenging the legal status of the additional Trustees?”
In relation to these issues the trial court made the following findings of fact:
“Alfred I. duPont executed his Last Will & Testament on November 19, 1932. Subsequently, Mr. duPont executed Codicils thereto dated March 4, 1933, and January 15, 1935, respectively. Mr. duPont died a *1136 resident and citizen of Duval County, Florida on April 29, 1935. His Last Will & Testament and Codicils thereto were admitted to probate by Order of the County Judge of Duval County, Florida, dated May 25, 1935. The executors administered the Estate and distributed the remaining assets to the Trustees.
The entire residuary Estate of Mr. duPont was placed in the Testamentary Trust. Except for several small annuities, Mrs. du-Pont was the sole beneficiary of the Trust for life. During her lifetime therefore, and at all times material to the issues of fact and of law herein determined and the declarations announced herein, the Alfred I. du-Pont Testamentary Trust was entirely a private, as opposed to a charitable trust. Upon her death, the Trustees were instructed to:
‘. . . cause to be incorporated a corporation for charitable purposes, to be designated and known as “The , Nemours Foundation” . . . and my Trustees are hereby directed to pay over, at convenient intervals, to the said corporation, the net income of my estate, subject to the annuities and legacies hereinabove mentioned for the purpose of maintaining the said Estate of “Nemours” as a charitable institution . . . .’
Mrs. duPont and the other Trustees of the Estate caused the creation under the laws of Florida of The Nemours Foundation as a non-profit charitable corporation. They also caused to be constructed, maintained and operated by The Nemours Foundation on the grounds of Nemours in Wilmington, Delaware, the Alfred I. duPont Institute, a charitable hospital operated for the care and treatment of crippled children. After completion of the hospital, Mrs. duPont irrevocably assigned to The Nemours Foundation an undivided 12 percent of her income from the Trust, from which the cost of operating the hospital at Nemours was provided.
Upon Mrs. duPont’s death, except for several small annuities still being paid out, the entire income from the Trust became payable to The Nemours Foundation. Because of the large additional sums that became available to the Foundation, the Trustees originally filed this action to obtain constructions of the Will of Mr. duPont and to receive instructions of the Court as to the authorized use of such additional funds, so as to properly implement Mr. duPont’s testamentary instructions.
This Court, in the final judgment entered herein on December 31, 1971, declared that:
‘Based upon the evidence and the law applicable thereto, the Court finds that the Last Will and Testament and Codicils thereto of Alfred I. duPont require the Trustees to establish, maintain and operate a charitable institution. The charitable institution which Mr. duPont’s Trusteés are required to establish does, in fact, require the construction, maintenance and operation of a hospital as the primary and dominant purpose of the institution . . .’ (Emphasis Supplied)
Subsequent to the Final Judgment and in compliance therewith, the Trustees have commenced implementation of a plan to establish at ‘Nemours’ a modern hospital complex, which will cost in excess of sixty million dollars to construct and equip. Since the present Trustees would be required to enter into binding agreements for the expenditure of approximately sixty million dollars for the purposes hereinabove set forth, they, pursuant to this Court’s Order dated December 31, 1971, made application to the Court to have their legal status as Trustees determined and declared.
The Will and Codicils thereto named three individual trustees: Mrs. Jessie Ball duPont (Mr. duPont’s widow), Edward Ball (Mrs. duPdnt’s brother), and Reginald D. Huide-koper (Mr. duPont’s son-in-law), and a corporate trustee, the Florida National Bank of JacksonvilleFlorida. Said trustees qualified and received distribution of the residuary estate from the executors in 1939. The principal assets received by such trustees and their inventory value totaled $54,666,-061.
It is apparent from the Trustees’ minutes and other evidence, oral and documentary, *1137 in the record herein, that from the very beginning the Trustees sought to implement the plans and purposes expressed by Mr. duPont during his lifetime. The trustees in 1965 still retained ownership of substantially all of the assets owned by Mr. duPont at the time of his death. They still owned the E. I. duPont Company stock, the stock in the Florida National Group of banks, and the stock in St. Joe Paper Company which had been acquired by merger of other corporations in which Mr. duPont owned stock into St. Joe Paper Company. The Trustees took an active part personally in the expansion and management of the banks owned or controlled by the trust, proceeded with the expansion of the paper mill at Port St. Joe, Florida, acquired more timberlands in West Florida and South Georgia, and continued the development and operation of the various other businesses owned by Mr. duPont, such as Apalachicola Northern Railroad Company and St. Joseph Telephone & Telegraph Company.
The Alfred I. duPont Trust in twenty-six years changed from a basically passive to a very active Trust. That fact is demonstrated by documents admitted into evidence and testimony of petitioner Trustees themselves, which show that the assets of the Trust changed and increased in size and complexity from 1939 to 1965 in the following ways:
1. St. Joe Paper Company, or its wholly-owned predecessor corporations, owned 372,533 acres of' woodlands in 1939. By 1965, this figure had increased to 996,294 acres; by 1967, the acreage owned by St. Joe had increased to 1,003,137 acres of woodlands.
2. St. Joe’s paper mill at Port St. Joe had been built, and had been enlarged substantially from a small mill costing $7,200,000 to a much larger mill, together with a corru-gator, bleach plant, and 17 box plants, at a cost of more than $97,000,000.
3. St. Joe had acquired overseas operations in Ireland in 1964 and 1965.
4. St. Joe Telephone and Telegraph Company, which was owned by Mr. duPont prior to his death, had expanded its services from 167 telephones in 1930 to 8,996 telephones in 1965 and to 10,203 telephones in 1967.
5. Apalachicola Northern Railroad, which was owned by Mr. duPont at the time of his death, had grown from $3.1 million in assets in 1934 to 8.5 million in 1965.
6. The Florida National Group of Banks had grown from eight banks, with a book value of $2,226,000 and deposits of $27.3 million in 1939 to thirty banks, with a book value of $79.3 million and deposits of $771 million, in 1965.
7. The Florida East Coast Railway, acquired since 1939, had become a major asset of the Trust. By 1967, the FEC had assets of $87.8 million. Operating revenues of the FEC were $24.3 million in 1965 and $23.6 million in 1967.
8. One of the measurements used by the lay and expert witnesses to indicate the growth in the corpus of the Trust was that of the dollar value of such assets. The stated book value or cost of the assets as reflected in the reports of the Trustees to this Court in 1939 was $54,666,061.02, and the stated value on December 31, 1965, was $103,277,768.64.
9. The only testimony submitted as to the market value of the assets in September of 1939 was that such assets were worth approximately $72,500,000.
10. The only testimony as to market value of the Trust as of December 31, 1965, was $655.6 million. This estimate utilized market value for the traded securities and attempted to evaluate the one million acres of land and other investment real estate owned by St. Joe Paper Company, but the value assigned ($254 million) to the one million acres of woodlands, the investment properties owned by St. Joe Paper Company and the standing timber is not relied upon by the Court.
The above-described growth in size, value and complexity of the assets of the Trust was made possible to a great extent by the investment practices followed by the Trustees. Mr. Edward Ball testified that Mrs. duPont, the recipient of all of the net in *1138 come of the Trust during the time involved, had independent wealth which left her without need for those funds; that she preferred to have the Trusts’ funds invested in developing properties with growth value, because she wanted to build up a large trust estate. The Trustees, with her consent and leadership, thus supported the purposes set out in her husband’s Will, rather than invest in high-yield properties from which she personally would have received a much larger income. The documentary evidence herein tends to support Mr. Ball’s testimony and no evidence to the contrary was offered.
Petitioners called two expert witnesses. One, Dr. George P. Baker, who testified as to the need to elect additional Trustees in 1965 and again in 1967, was particularly well qualified by experience to testify on that subject, having been Dean of the Harvard Graduate School of Business Administration, a director in numerous large corporations, including Mobil Oil, Lockheed Aircraft, and The First National Bank of Boston, and a member of several committees and commissions appointed by the President, including the President’s Commission on Postal Organization and the President’s Council on Executive Organization. As a Trustee of the Penn Central Railroad, he had had the experience and responsibility of serving as a Trustee of a diversified operating business with several hundred million dollars of assets.
Dr. Baker testified, based on his investigation and examination of the documents offered in evidence by Petitioners and having heard all of the testimony put on by Petitioners at the trial, that in his opinion, an increase in the number of individual Trustees from three to six in May of 1965, and from six to seven in December of 1967, each, in his opinion, was necessary for the preservation, conservation and betterment of the Trust Estate. He went further, adding that ‘actually failure to do so would have bordered on irresponsibility.’
The Court does not base its decision on that point on Dr. Baker’s testimony but does consider it a respected source of support to the conclusions independently reached by it. Mr. Huidekoper died in 1943. Mr. Elbert Dent succeeded him as a Trustee by virtue of his designation as such in a codicil to Mr. duPont’s Will. He served as one of three individual Trustees, along with Mrs. duPont and Mr. Ball, until his sudden and unexpected death in May, 1965. During that time, the corporate Trustee had possession and custody of the trust assets, and performed the trust accounting functions, while the individual Trustees, Mrs. duPont, Mr. Ball and Mr. Elbert Dent, devoted substantially all of their time to the business activities of the trust and the management of its assets. They served as key officers and directors of the businesses controlled by the trust, and helped effectuate the considerable growth described above.
The death of Elbert Dent in May, 1965, left the two remaining individual Trustees in a serious predicament. Mr. Dent had been the youngest of the three individual Trustees and logically should have outlived the other Trustees and arranged for an orderly succession of Trustees. Mr. Ball then was 78 years old, and had suffered at least one serious heart attack, causing hospitalization of five or six weeks. Mrs. duPont was 82 years old and severely limited in her physical activities by reason of a broken hip. The evidence showed that she then was attended by nurses ‘around the clock.’ Advancing age and developing infirmities were substantially limiting the ability of these individual Trustees to continue management of the Trust assets and to oversee the operation of The Nemours Foundation. Both Mr. Ball' and Mrs. duPont had lived long beyond the life expectancy which they had at the time of Mr. duPont’s death.
Faced with those circumstances, the surviving Trustees, Mrs. duPont, Mr. Ball and a representative of the Florida National Bank, met at Nemours on May 10,1965, two days after Elbert Dent died, elected William B. Mills to fill the vacancy created by the death of Mr. Elbert Dent and then elected three additional individual Trustees, Tom S. Coldewey, Alfred duPont Dent and A. L. Hargraves. All of the new Trustees, *1139 except Mr. Alfred Dent, were vice-presidents of St. Joe Paper Company. Mr. Mills had also been, for about a month, president of Florida National Bank of Jacksonville, the corporate trustee. Alfred duPont Dent, Mr. duPont’s grandson, had been familiar with the estate’s operations through the participation of his father and mother in the estate’s activities and was experienced in the investment and stock brokerage business.
Counsel for Mr. Dent read into the record statements from a deposition of Mr. Mills that Mr. Ball advised all of the Trustees at the meeting on May 10, 1965, when he and the three additional Trustees were elected, that the Trustees had been advised prior to that time by Mr. H. P. Adair, attorney for the Trust, that they had the power to add additional trustees under the express terms of the Will. The trustees, apparently for that reason, made no attempt to seek court approval of such additional trustees.
Mr. Edward Ball testified that the factors related above were discussed and taken into consideration by him, Mrs. duPont and Mr. Mills, who then was president of the corporate trustee, before the trustees decided to elect additional trustees on May 10, 1965. He also testified without objection from any party, that they then agreed that it was not only desirable but necessary to do so. He said that he agreed to to so because he deemed it best for the conservation, protection and betterment of the Estate to do so.
Defendant Trustee Mills was in the courtroom throughout Mr. Ball’s testimony. Despite the fact that he had denied in his answer that such additional Trustees were legally elected, he never took the witness stand to support his position or to testify that any of the testimony given by Mr. Ball or that of the other Trustees regarding the decision to elect additional Trustees was or was not true.
Petitioners submitted testimony that the election of the three additional Trustees did not long meet the needs of the Trust Estate for several unanticipated and unforeseen reasons.
First, Mr. Hargraves resigned as a Trustee less than nine months after his election and his resignation was accepted at a special meeting of the Trustees on January 7,1966. During the same nine-month period, Mr. Alfred Dent suffered serious injuries in an automobile accident, which kept him hospitalized for several weeks and disabled him from participating as an active Trustee for more than a year. Mr. Mills suffered serious problems with his hip which required special surgical techniques and lengthy convalescence. Mrs. duPont’s health continued to worsen and she became even less active in the affairs of the Trust during. 1966 and 1967. She never attended a Trustees’ meeting after May 10, 1965. A second fall and serious injury to her other hip had all but totally disabled her.
An amendment to the Federal Bank Holding Company Act, which removed the Trust’s exemption from its provision, was enacted into law. It required the Trust to sell either its bank stock or all of its other operating assets. Finally, the Florida East Coast Railway strike was still going on, and the plans and efforts to modernize and streamline the railroad’s operation were moving forward. By reason of those circumstances, the Trustees recognized that it was necessary to the conservation, protection and betterment of the Trust Estate to add one or more additional trustees.
At a special meeting of the Trustees held on December 4, 1967, on motion by Defendant Mills and unanimously carried, it was ‘RESOLVED that the increasing responsibilities and duties placed on the Trustees are such as to require an additional Trustee, with special qualifications tó supervise certain interest areas of the Trust.’ Messrs. W. L. Thornton and J. C. Belin then were elected, one apparently to fill the vacancy created by Mr. Hargraves’ resignation and one to fill the newly created position.”
Petitioners Ball, Belin, Coldewey, Thornton and Florida First National Bank of Jacksonville asked the trial court to construe the Last Will and Codicils as giving the trustees therein provided for the power, to be exercised at their discretion, to elect *1140 additional trustees of the estate if they deemed it best for the conservation, protection and betterment of the estate. They asserted that on May 10, 1965, and December 4, 1967, when the then incumbent trustees elected additional trustees, they deemed it best for the conservation, protection, and betterment of his estate to do so; that the evidence demonstrated that the election of additional trustees was in fact for the conservation, protection and betterment of the estate and that Coldewey, Dent, Belin and Thornton were validly elected trustees.
Petitioner Dent asked the court to decide that, even though the language of the Will and Codicils does not expressly grant authority to add additional trustees, ample authority exists under the common law and applicable statutes for the court to authorize such additional trustees upon a showing of changed conditions and that such additional trustees appear to be conducive to the better administration of the trust; that the election of the additional trustees was required for the conservation, protection and betterment of the trust estate and was necessary to the continued management of the estate to accomplish the trust purposes; and that the election of the additional trustees was legally valid.
The State Attorney of the Fourth Judicial Circuit, defendant below, representing the unknown charitable beneficiaries of the trust, argued that the broad powers of the Will gave the trustees authority to appoint additional trustees and that if it did not, that either under the statutory or common law provisions of deviation, the deviation should be approved in this instance.
Appellee, The Nemours Foundation, asked the court to rule that appellant Mills and appellees are precluded from challenging the legal status of the additional trustees under the doctrines of estoppel, laches, res judicata and waiver. The trial court, however, did not rule on that issue because it considered it would be premature to rule on such at this time in view of the restricted nature of the testimony permitted by its pretrial order and its declaratory judgments announced in its supplemental declaratory judgment.
Appellant Mills contended throughout that the elections of the additional trustees were invalid.
In construing the Will and Codicils, the trial court found that Alfred I. duPont conferred upon the trustees and vested in them the widest powers and the greatest discretion. It pointed to Item 6(h) which authorized them generally in the administration of his estate, “to do every and all things that they may deem best for the conservation, protection and betterment of my estate, as fully and completely as I might do, personally, were I alive and able to act for myself.” The trial court found that the Will makes plain Mr. duPont’s intent and purpose to leave to the discretion of his trustees the time and manner of doing the things which he charged them with doing; except where the Will made express provision otherwise, that there is no manifestation in his Will of an intent to limit the individual trustees thereunder to a maximum of three; that refusal by the court to allow the trustees the broad powers which Mr. duPont intended to vest in them would tend to defeat, and in 1965 and 1967 probably would have defeated, his paramount purpose in creating the trust estate. The court found that the Will and Codicils vested in the trustees the discretionary power to appoint additional trustees to those provided for in the Will, if they deemed it best for the conservation, protection, and betterment of the estate to do so; that the trustees at the times of election of additional trustees did deem it best for the conservation, protection and betterment of the estate to elect the additional trustees and that the additional trustees were validly elected.
In so ruling the trial court stated as follows:
“7. Where there has been a change of circumstances after the creation of the Trust and it is possible to find a manifestation of intention by the settlor that the trustee may adjust his conduct to the change and act as he would not otherwise *1141 be intended to act, the trustee is not deviating from the terms of the trust in so acting. Scott on Trusts, 3rd Ed., Sec. 167, pp. 1268.
8. The jurisdiction of equity to enforce trusts should and does include power to vary the details of administration which the settlor has prescribed in order to secure the more important result, namely, obtaining for the beneficiaries the advantages which the settlor stated he wished them to have. Bogert, 2nd Ed., Sec. 561 p. 129.
9. It appears to the Court that Mr. du-Pont, when preparing his Will, anticipated that conditions such as those which confronted his Trustees in 1965 and 1967 would arise during the administration of his Estate, and that he intended to give his Trustees all powers necessary to enable them to solve such problems by including those expressly stated in Item 6(h) and Item 6(q).
10. This Court has the power to ratify acts of the Trustees in electing additional Trustees in 1965 and again in 1967 if it is of the opinion that such consent would have been forthcoming if it had been requested at that time. [Citations omitted.]
11. This Court has the power and, where facts and circumstances require, has the duty to ratify, by proper Order, the actions of the then incumbent Trustees in 1965 and 1967 in electing Coldewey, Dent, Belin and Thornton as of the date of their respective elections and to confirm the legal status of each named individual to act as a Trustee of the Estate from the date of his election.”
In discussing the other alternative argued by appellee Dent, the court said:
“14. The Court has the power to grant to a trustee a power which is highly convenient or necessary to the proper execution of the trust but which the settlor did not expressly give to the trustee, Bogert on Trusts, Handbook Series, Fifth Edition, Sec. 88, p. 319, citing Wallace v. Jullier [Julier], 147 Fla. 420, 3 So.2d 171[711] (1941).
15. This Court on May 10, 1965, and December 4, 1967, had the power, under the common law and the then existing circumstances, to permit the then incumbent Trustees of the Alfred I. duPont Testamentary Trust to deviate from any restrictions and conditions then contained in Mr. duPont’s Will and elect additional Trustees for cause shown.
16. Even if the provisions of the Will should be read so as to expressly restrict the power of trustees to add additional trustees, nevertheless this Court is authorized by Sections 737.403(1), 737.502, and 737.507, Florida Statutes (1977), to permit the trustees to deviate from such restriction for cause shown.
17. The language of that statute conditioning the power of deviation upon a showing of ‘cause’ means that the trial court may, in its discretion, approve the deviation upon a finding that it is reasonable and not arbitrary or capricious.
18. This Court has power to ratify and approve actions of the Trustees in changing the number of individual trustees, if the Court could have done so in 1965 and 1967 under the common law and its then inherent power.”
The trial court found the election of the additional trustees to be valid under either or both of the alternatives stated above— (1) the broad powers of the Will gave the trustees power to amplify their number, and (2) even if the Will did not grant the trustees such power, the court, under the evidence presented, was authorized to approve and ratify, and did approve and ratify, the appointment of the additional trustees. While we disagree with the former, we agree with the latter.
Mr. duPont did give his trustees very broad powers in the administration of the trust under Item 6(h) of the Will, but we are unable to conclude from this, as did the trial judge, that the power to increase the number of trustees was included therein. Paragraph (h) is one of 17 powers granted to the trustees under Item 6 of the Will. Reading Item 6 in its entirety indicates that it deals only with the powers of the four *1142 trustees in asset management of the trust. Item 6 does not pertain to the internal structure of the trust administration. Under the doctrine of ejusdem generis, as applied to construction of this Will, this general powers clause is limited to matters similar to those enumerated within the particular portion of the Will containing the general clause. Compare Given v. Hilton, 95 U.S. 591, 24 L.Ed. 458 (1877), in which the United States Supreme Court held:
“It is doubtless true that in the construction of wills, as well as of statutes, where certain things are enumerated, and a more general description is coupled with the enumeration, that description is commonly understood to cover only things ejusdem generis with the particular things mentioned. This is because it is presumed the testator had only things of that class in mined . . . ”
There is nothing in the Will of Mr. duPont to indicate that the provisions of Item 6(h) were intended to reach beyond the management of the trust corpus. Item 5 of the Will is the item which deals with the trustees. It vests certain property in the trustees, appoints the original four trustees, and sets forth the details for their succession. It provides only for successors to the original four trustees. If Mr. duPont had intended to give the trustees authority in their discretion to add additional trustees, he would have certainly mentioned it specifically in his Will. It is not reasonable to conclude that he intended such authority to be included in the general powers of the trustees contained in the item dealing with asset management. We, therefore, disagree with and do not find competent substantial evidence to support the trial court’s finding that Mr. duPont anticipated the conditions such as those confronting his trustees in 1965 and 1967 and intended to give them all powers necessary to enable them to solve such problems, including power to increase their number.
We agree with the trial court’s ruling that if the trustees were not authorized to amplify their number, the trial court had authority to approve the appointment of the additional trustees and declare them to be valid trustees pursuant to the evidence presented in this case.- As pointed out by the trial court, Florida courts are authorized by statute to permit deviation by trustees from restrictions in trust instruments “for cause shown.” § 737.403(1) and § 737.-507, Florida Statutes (1977). § 737.507 provides as follows:
“Power of court to permit deviation. This part does not affect the power of a court to relieve a trustee from any restrictions on his powers and duties that are placed upon him by the governing instrument or applicable law for cause shown and upon complaint of the trustee, state attorney, or an affected beneficiary and notice to the affected parties.” (Emphasis supplied.)
§ 737.403(1) as pertinent here is the same. Appellee Mills contends that the above statutes should be construed to require the restrictive rule stated in the Restatement (Second) of Trusts, § 381:
“The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.”
In this respect appellee Mills quotes from 30 Fla.Jur., Statutes § 112 as follows:
“Statutes are to be construed with reference to appropriate principles of the common law. And, when possible, they should be co construed as to make them harmonize with existing law, and not conflict with long settled principles.”
While this statement of the law is generally applied, a showing of good cause as mandated by the Florida statute is such a far cry from the strictures of § 381 in the Restatement (Second) of Trusts that we are unable to find that the Legislature intended such a result. If the Legislature had intended to place such restrictions on the court, it would have been more restrictive in the language used in §§ 737.507 and 737.403(1).
*1143 In naming four trustees and providing for their succession, Mr. duPont neither directed that the trustees not be expanded in the future nor that they not be diminished in the future. We have no clear expression that Mr. duPont actually intended that there be no future change in the number of trustees. We have only the fact that he initially named four trustees to administer the trust. The record shows that the trustees’ action in increasing their number was upon the advice of their counsel that they had the power under the Will to take such action. Its validity was not questioned until some years later. The trial court was entirely correct in its determination that, under the evidence presented in this case, the additional trustees were highly convenient or necessary to the proper administration of the trust; that their election was reasonable and not arbitrary or capricious and should be approved. The circumstances shown by the trial court’s findings of fact established good cause and fully authorized the trial court’s nunc pro tunc ratification and approval of the appointment of the additional trustees.
Appellant relies heavily upon the opinion of the Court of Civil Appeals of Texas, Houston, (14th Dist.) in Moody v. Haas, 493 S.W.2d 555 (1973). There the settlors of a very large charitable trust had provided for three trustees. The three subsequently expanded their number to seven. The trial court declined to enjoin the increase, and the Court of Civil Appeals reversed. There, unlike here, the evidence showed no need for an amplification of the number of trustees, the court pointing out:
“As we have noted the ‘size’ of the Foundation, the value of its assets, is less than when it was established. Its ‘functions’ have been well within the boundaries of the stated purposes of its charity. Its ‘complexity’ is of less degree by virtue of the disposition of certain properties. There is no evidence of the existence of facts relevant to those facets of the Foundation which would authorize a departure from the settlors’ expressed intent as to the structure by which their charity was to be administered.”
Appellant Mills contends that an additional point which this Court should determine on this appeal is whether, even if the expansion of the board of trustees in 1965 or in 1967 had been appropriate, the trial court committed reversible error in approving the particular individuals elected at those times. This was not one of the issues ruled upon by the trial court in the partial final judgment here on appeal. The trial court severed that issue for a separate trial.
We have considered appellant’s remaining point — whether appellant has been denied procedural due process throughout this litigation. We find no denial to appellant of procedural due process.
AFFIRMED.
LARRY G. SMITH and WENTWORTH, JJ., concur.